## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **SIMRATPAL SINGH**,<br>8818 Moverly Ct.<br>Springfield, VA 22152<br><br>     *Plaintiff*,<br><br>v.<br><br>**ASHTON B. CARTER**, in his official<br>capacity as Secretary of Defense,<br>1400 Defense Pentagon<br>Washington, DC 20301<br><br>**THE UNITED STATES DEPARTMENT<br>OF DEFENSE**,<br>1400 Defense Pentagon<br>Washington, DC 20301<br><br>**PATRICK J. MURPHY,**<br>in his official capacity as<br>Acting Secretary of the U.S. Army,<br>101 Army Pentagon<br>Washington, DC 20310<br><br>**LIEUTENANT GENERAL JAMES C.<br>MCCONVILLE**, in his official capacity as<br>Deputy Chief of Staff, G-1, U.S. Army<br>300 Army Pentagon<br>Washington, DC 20310<br><br>**THE UNITED STATES DEPARTMENT<br>OF THE ARMY**,<br>101 Army Pentagon<br>Washington, DC 20310<br><br>    *Defendants*. | Civil Action No. _____<br><br><br>**VERIFIED COMPLAINT**<br>(Jury Requested) |

Eric S. Baxter (D.C. Bar No. 479221)
Eric C. Rassbach (D.C. Bar No. 493739)
Daniel Blomberg (*pro hac vice* pending)
Diana M. Verm (D.C. Bar No. 1811222)
The Becket Fund for Religious Liberty
1200 New Hampshire Ave. NW, Suite 700
Washington, DC, 20036
(202) 955-0095 PHONE
(202) 955-0090 FAX
*ebaxter@becketfund.org*

Amandeep S. Sidhu (D.C. Bar No. 978142)
Emre N. Ilter (D.C. Bar No. 984479)
McDermott Will & Emery LLP
500 North Capitol Street, N.W.
Washington , DC, 20001
(202) 756-8000 PHONE
(202) 756-8087  FAX
*asidhu@mwe.com*

Harsimran Kaur Dang (D.C. Bar No. 493428)
Gurjot Kaur (*pro hac vice* pending)
The Sikh Coalition
50 Broad Street, Suite 1537
New York, NY, 10004
(212) 655-3095 PHONE
*harsimran@sikhcoalition.org*

*Counsel for Plaintiff*

## **NATURE OF THE ACTION**

1.   Plaintiff Simratpal Singh is a Captain in the United States Army, in the 249th Engineer Battalion Prime Power at Fort Belvoir, Virginia, where he is an Assistant Operations Officer.

2.   Captain Singh is also a devout member of the Sikh faith.

3.   A core tenet of Sikhism—mandated by the Sikh prophets and required by the *Rehat Maryada*, the official Sikh Code of Conduct—forbids Sikhs from shaving or cutting their hair, (including facial hair) which must be worn in the *dastaar* (turban).

4.   For Captain Singh, being forced to shave, cut his hair, or not wear the *daastar* would be a severe violation of his conscience, yet under the Army's grooming policies, he is subject to severe penalties—including dishonorable discharge—just for maintaining these articles of faith.

5.   When general military rules burden a soldier's faith, binding Department of Defense Instructions and Army regulations *require* the Army to accommodate the soldier's religious exercise, so long as the "accommodation would not adversely affect mission accomplishment." DoDI 1300.17(4)(*f*); AR 600-21 § 5-6.

6.   There is no doubt that the Army can accomplish its mission while allowing Captain Singh to maintain his articles of faith while serving as an Assistant Operations Officer for the 249th Engineer Battalion at Fort Belvoir, Virginia.

7.   Captain Singh's immediate commander, Lieutenant Colonel Julie Balten, has recommended that he be allowed to serve without being forced to violate his conscience.

1

8.   Moreover, Sikhs have regularly served in the United States military with their articles of faith intact, including in combat beginning as early as World War I and continuing through the Vietnam War.

9.   It was only in the early 1980s that the military began barring Sikhs from military service because of their faith.

10. But even then, Sikhs already serving were grandfathered in without being forced to violate their conscience. And in just the last six years, the Army has admitted at least three fully-observant Sikhs, all who have served with distinction—including in combat zones—with their articles of faith fully intact.

11. America's allies around the world, including Canada, Great Britain, India, and Australia also allow observant Sikhs to serve in their militaries. Indeed, Canada's new Defense Minister— a decorated military veteran who advised top U.S. generals in Afghanistan—is himself an observant member of the Sikh faith.[1]

12. This Court has already held that the Army lacks general justification for barring observant Sikhs from serving their country. *Iknoor Singh v. McHugh*, 109 F. Supp. 3d 72 (D.D.C. June 12, 2015).

13. Despite the long history of exemplary service by Sikhs in the United States military and utter lack of any justification for generally barring them, the Army has refused to fully grant

---

[1]   *See* Siobhán O'Grady, *Canada's New Defense Minister Made His Own Gas Mask to Work With His Sikh Beard*, Foreign Policy, Nov. 5, 2015, http://foreignpolicy.com/2015/11/05/canadas-new-defense-minister-made-his-own-gas-mask-to-work-with-his-sikh-beard/  (last  visited  Nov. 24, 2015).

2

Captain Singh's formal request for a religious accommodation that would allow him to continue serving as an Army engineer without violating his deeply held religious convictions.

14. Captain Singh has been granted a temporary accommodation to wear unshorn hair, a beard, and a turban, as required by his faith. That accommodation ends on March 31.

15. On Wednesday, February 24, 2016, after months of suggesting his accommodation would likely be made permanent—as has routinely happened for Sikh soldiers in the past—Defendants abruptly informed Captain Singh that, because of his Sikh religion, he must immediately undergo extraordinary, targeted, repetitive testing ostensibly to ensure he can properly wear a combat helmet and safety mask. *See* Exhibit 16 (Memorandum from Debra S. Wada, Assistant Secretary of the Army (Manpower and Reserve Affairs) to Commanding General, U.S. Army Corps of Engineers (Feb. 23, 2016)) ("the Wada Memorandum").

16. Captain Singh was initially instructed to schedule his own gas mask fit testing, which was scheduled to take place at Fort Belvoir (Captain Singh's home base) consistent with the Army's standard practices and procedures (as outlined in A.R. 350-1). Brushing aside this standard gas mask testing—which is applied to all Army soldiers—Captain Singh was informed on the afternoon of Friday, February 26, that he was under orders to report early the next week, on Tuesday, March 1, for the helmet testing contemplated in the Wada Memorandum. Then at 8:00 PM that same evening (Friday, February 26), Captain Singh was ordered to report to Aberdeen Proving Grounds in Maryland on Tuesday, March 1, following the helmet testing at Fort Belvoir, where he would be sequestered for three days for safety-mask testing.

3

17. No other soldiers in the Army have been treated in this manner or subjected to similar tests as a condition for remaining in the Army.

18. This discriminatory treatment is unfounded and violates the Army's own regulations.

19. Moreover, it infringes Captain Singh's free exercise and free speech rights secured to him by the Religious Freedom Restoration Act (RFRA) and the United States Constitution.

20. Captain Singh thus seeks declaratory and injunctive relief protecting him from being forced to choose between serving his country and remaining true to the core tenets of his faith.

## JURISDICTION AND VENUE

21. The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1361.

22. Venue lies in this district pursuant to 28 U.S.C. § 1391(e)(1).

## IDENTIFICATION OF PARTIES

23. The Plaintiff, Captain Singh, is a practicing Sikh and a decorated member of the United States Army stationed at Fort Belvoir, Virginia.

24. Defendants are appointed officials of the United States government and United States governmental agencies responsible for the United States military and its grooming policies.

25. Defendant Ashton B. Carter is the Secretary of the United States Department of Defense. In this capacity, he has responsibility for the operation and management of the armed forces. Secretary Carter is sued in his official capacity only.

26. Defendant United States Department of Defense is an executive agency of the United States government and is responsible for the maintenance of the United States military.

27. Defendant Patrick J. Murphy is the Acting Secretary of the United States Army and is responsible for the operation and management of the United States Army. Secretary Murphy is sued in his official capacity only.

28. Defendant Lieutenant General James C. McConville is the Deputy Chief of Staff, G-1, U.S. Army. In this capacity, he has responsibility for religious accommodations in the Army, including Captain Singh's accommodation. General McConville is sued in his official capacity only.

29. Defendant Department of the Army is a department of the United States military and is responsible for the promulgation and administration of its own grooming policies and regulations.

## FACTUAL ALLEGATIONS

Captain Singh's Faith

30. Sikhism is a monotheistic religion that originated in the fifteenth century in the Punjab region of South Asia.

31. While relatively young compared to other major world religions, it is the world's fifth largest faith tradition with nearly 25 million adherents.[2]

32. There are approximately 500,000 Sikhs in the United States.[3]

33. The founder of the Sikh faith, Guru Nanak, was born in 1469 in Punjab, India.

34. The Sikh religion is monotheistic, believing in one God who is all loving, all pervading, and eternal. This God of love is obtained through grace and sought by service to mankind.

_____

[2]    *See* The Pew Forum on Religion and Public Life, *The Global Religious Landscape: A Report on the Size and Distribution of the World's Major Religious Groups as of 2010*, at 9 n.1 (2012), http://www.pewforum.org/files/2014/01/global-religion-full.pdf.

[3]    *See* S. Con. Res. 74, 107th Cong. (2001).

35. Guru Nanak rejected the caste system, and declared all human beings, including women, to be equal in rights and responsibilities and ability to reach God. He taught that God was universal to all—not limited to any religion, nation, race, color, or gender.

36. Consistent with the teachings of the Sikh gurus, Sikhs wear external articles of faith to bind them to the beliefs of the religion. Unlike some other faiths, where only the clergy maintain religious articles on their person, all Sikhs are required to wear external articles of faith.

37. These articles of faith, such as unshorn hair (*kesh*) and the turban, distinguish a Sikh and have deep spiritual significance.

38. Maintaining uncut hair (including a beard) is an essential part of the Sikh way of life—one cannot be a practicing Sikh without abiding by this tenet of faith.

39. Guru Nanak started the practice, regarding it as living in harmony with the will of God. The Sikh Code of Conduct, called the *Rehat Maryada*, outlines the requirements for practicing the Sikh way of life.[4]

40. All Sikhs must follow the guidelines set forth in the *Rehat Maryada*.

41. The *Rehat Maryada* explicitly instructs that Sikhs must "[h]ave, on your person, all the time . . . the *keshas* (unshorn hair)." Exhibit 1 (excerpt of *Rehat Maryada*). The *Rehat Maryada* prohibits the removal of hair from the body as one of four major taboos. One of the other taboos on this list is adultery. That cutting one's hair is a moral transgression as serious as committing adultery speaks to the immense significance of uncut hair in the Sikh religion.

---

[4] *Sikh Rehat Maryada in English*, SGPC.net, http://new.sgpc.net/sikh-rehat-maryada-in-english/ (last visited Nov. 25, 2015)

42. The *Rehat Maryada* also mandates that Sikhs wear a turban which must always cover a Sikh's head. The turban reminds a Sikh of his or her duty to maintain and uphold the core beliefs of the Sikh faith, which include working hard and honestly, sharing with the needy, and promoting equality and justice for all. When a Sikh wears a turban, the turban ceases to be simply a piece of cloth and becomes one and the same with the Sikh's head.

43. Historically, uncut hair and turbans have been central features of the Sikh identity. For example, in the 18th century, Sikhs in South Asia were persecuted and forced to convert from their religion by political leaders. The method of forcing conversions was to remove a Sikh's turban and cut off his or her hair.

44. As resistance to such forced conversions, many Sikhs chose death over having their turbans removed and hair shorn.

45. Since then, denying a Sikh the right to wear a turban and maintain unshorn hair has symbolized denying that person the right to belong to the Sikh faith, and is perceived as the most humiliating and hurtful physical injury that can be inflicted upon a Sikh.

<u>Captain Singh's Commitment to the Sikh Faith</u>

46. Captain Singh was born in the Punjab region of India into an observant Sikh family.

47. From the time of his early childhood in India and after moving to the United States at age nine, he maintained unshorn hair covered with a *patka*, a small turban often worn by Sikh children.

48.  When Captain Singh's beard came in, his father taught him how to properly wrap and wear the turban.

49. Throughout high school, Captain Singh maintained the Sikh articles of faith, wearing the turban and never cutting his hair or shaving.

50. Growing up, Captain Singh regularly attended the Sikh temple or *gurdwara* to hear preaching and to partake in *langar*.

51. *Langar* means "open kitchen" and is a form of communal dining that takes place in the *gurdwaras*. Individuals of any faith or no faith at all may participate. The food is simple vegetarian fare so that all may partake regardless of religious or other dietary restrictions. It is prepared by volunteer members of the Sikh community and served by them to participants who sit intermingled in rows on the floor.

52. *Langar* serves as a continuous reminder of the Sikh ethics of equality, generosity, inclusiveness, and care for the poor.

53. Regular participation in *langar* helped instill in Captain Singh the importance of hard work, a recognition of the good in others, and a willingness to sacrifice for the larger good. It also influenced his commitment to be a vegetarian. Though not required of Sikhs universally, Captain Singh believes that it is morally wrong to take the life of another creature simply for pleasure.

54. On Sundays, Captain Singh enjoyed listening to the preaching about Sikh scripture and history, and the musical recitations of Sikh scripture.

55. Captain Singh frequently heard stories of Sikhs who chose to die rather than remove their turban when subjected to forced conversions, and this theme became particularly poignant to him.

56. While remaining deeply connected to his Sikh heritage, Captain Singh thrived in his high school in Bellevue, Washington, earning excellent grades and participating on the soccer team and

wrestling squad. He participated in student government, serving as president of his sophomore class and as student-body treasurer the following year.

57. As a senior, he was selected from his class of nearly 400 students to serve on a teen advisory council for United States Congressman David Reichert.

58. Through that point in his life, he never experienced any negative repercussions from anyone because of his religion.

59. He never anticipated that the United States Army would be the first to pressure him to abandon his articles of faith.

<u>Decision to Join the Military</u>

60. Service in armed forces has always been—and continues to be—a central part of the Sikh identity. The Sikh martial tradition dates back to the late 17th century and Guru Gobind Singh's creation of the Khalsa, a spiritual order and army comprised of initiated Sikhs, to resist persecution by the Mughal Empire. Tales of Sikh courage and valor, as documented by the British, date back at least as far as their defeat of the Afghan Pathans in 1813 at the Battle of Attock.[5]

61. Sikh soldiers famously defeated the British at the Battle of Chillianwala in 1849 before being overpowered six weeks later by superior British weapons.[6] Sikh soldiers soon became

---

[5] Pico Iyer, *The Lions of Punjab*, Time, Nov. 12 1984, at 53, *discussed in* Rajdeep Singh Jolly, *The Application of the Religious Freedom Restoration Act to Appearance Regulations That Presumptively Prohibit Observant Sikh Lawyers From Joining the U.S. Army Judge Advocate General Corps*, 11 Chap. L. Rev. 155, 157 n.13 (2007).

[6] *Id*.

"among the sturdiest and trustiest men of the British army,"[7] with a group of twenty-one Sikhs famously repulsing an attack by thousands of Afghans for six hours at the Battle of Saragarhi in 1897[8] and with approximately 100,000 Sikhs—a disproportionately high number among Indian volunteer soldiers —fighting for the British in World War I.[9]

62. Today observant Sikhs proudly serve with their articles of faith intact in militaries around the world, most notably in India, Canada, Australia, and the United Kingdom, among others, and also as United Nations Peacekeepers, often working closely with American troops in troubled regions. In fact, Canada's recently appointed Minister of Defense, Lieutenant Colonel Harjit Sajjan, supported the U.S.-led coalition in Afghanistan and served as a special advisor to U.S. Army Lieutenant General James Terry, commander of the 10th Mountain Division.[10]

63. Captain Singh's own great grandfather fought with the British-Indian Army in World War I, battling through Kuwait and into Iraq, where he was injured by a gunshot to the leg. He later also participated in the struggle for India's independence.

64.  Captain Singh's father, in his young adulthood, sought to join the Indian Navy, although he was kept out, presumably by anti-Sikh sentiment that was prevalent at that time.

---

[7] *Id.*

[8] *Sikhs Prove Their Valor, Twenty-one Men Hold Sarhargarti Police Post Against 1,000 Orakzais Over Six Hours*, New York Times, Sept. 14, 1897.

[9] Jolly, *supra* note 5, at 157.

[10] *See* Christopher Guly, *Defense Minister Harjit Singh Sajjan: A Sikh Soldier's Climb to the Canadian Cabinet*, L.A. Times, Feb. 22, 2016, http://www.latimes.com/world/mexico-americas/la-fg-canada-sajjan-profile-20160222-story.html.

65. Familiar with this religious and family history, Captain Singh long desired to serve in the military.

66. Upon immigrating, Captain Singh developed a deep gratitude to the United States for granting his father political asylum and providing his family opportunities they would not have enjoyed in Punjab. Joining the Army seemed like the natural way to repay his country.

67. Captain Singh always assumed he would enter the Army as an enlisted soldier until a friend on the student council who was one year ahead of him in high school applied to the military academies. Learning for the first time about this opportunity, Captain Singh set his mind on attending West Point.

68. He ultimately received endorsements from Congressman David Reichert and Senator Maria Cantwell.

69. Well into the application process, it still had never occurred to Captain Singh that the Army would have a problem with his unshorn hair, beard and turban. At a recruiting event at the Seattle Convention Center, an officer from West Point casually mentioned the beard, joking that Captain Singh must be trying to grow it all the way out before he had to shave it. Captain Singh explained that he wore his beard for religious reasons. The officer indicated that he would look into whether an accommodation would be possible. When he later called and conveyed that an accommodation was not possible, Captain Singh realized for the first time that he faced a real dilemma.

70. Still not comprehending that he would be barred from serving his country because of his articles of faith, Captain Singh pressed forward with his application. Considering all the countries where faithful Sikhs serve in militaries around the world with their articles of faith intact, Captain

Singh believed that a way would open for him to both serve his country and remain true to his beliefs. Even on Reception Day, when entering West Point as a new cadet, Captain Singh continued to make inquiries about a religious accommodation. He separately approached two Majors, both who gave vague responses, saying they would inquire and get back to him.

71. As the induction process continued, however, and before Captain Singh fully understood what was happening, he found himself in the barbershop with the other cadets to be trimmed and shaved.

72. Forced into the untenable position of having to violate his Sikh religious requirements or lose the opportunity to attend West Point and serve his country, and believing he had no other option, Captain Singh succumbed under pressure and made the difficult decision to remove his turban, cut his hair, and shave his beard.

73. Despite the intense physical rigor of his first weeks at West Point, most excruciating for Captain Singh was looking at himself in the mirror each morning to shave. He constantly regretted not having pursued his religious rights more aggressively.

74. While the demands of West Point forced him to focus on his training, he always knew he was violating his conscience and lying about who he really was. Experiencing significant shame and disappointment in himself, he committed to return to his articles of faith whenever the opportunity first arose.

Military Service

75. Notwithstanding the weight of his decision to compromise his Sikh religious practices, Captain Singh went on to serve his country with a deep commitment to service and excellence.

76. He graduated from West Point in 2010, receiving his Bachelor of Science degree in electrical engineering with Honors. Exhibit 2 (Academic Record, United States Military Academy at West Point).

77. After graduation, Captain Singh attended the Officer's Basic Course at Fort Leonard Wood, Missouri. He was assigned to Military Occupational Specialty 12A for engineering and was posted to Fort Lewis, Washington, as Assistant Brigade Engineer on the Brigade Combat Team.

78. During this time, Captain Singh received high praise from his commanders. Exhibit 3 (Evaluation Report for Period of Feb. 15, 2011 through Jan. 3, 2012). In particular, Captain Singh was noted to be "the best lieutenant in the Brigade S3 section and one of the top 3 on the Brigade Staff." *Id.* at 2. While posted at Fort Lewis, Captain Singh "seized the opportunity to attend and graduate Ranger School," with his commander noting that "[h]e will be an extraordinary platoon leader" who should be promoted ahead of his peers. *Id.* At Ranger School, Captain Singh declined to request a special vegetarian diet to accommodate his religious beliefs because he wanted to survive on the same rations as everyone else. Instead, he gave away the meat in his rations to other soldiers. Though he lost thirty pounds, he never compromised his religious beliefs.

79. Upon successfully completing Ranger School, Captain Singh was assigned as platoon leader for a 24-soldier Route Clearance Platoon within the Stryker Brigade Combat Team. Exhibit 4 (Officer Evaluation Report for Period of Jan. 4, 2012 through Jan. 3, 2013). In that capacity, Captain Singh was forward-deployed to Operation Enduring Freedom in Kandahar Province from April 2012 to January 2013.

13

80. During his deployment, Captain Singh continued to receive the highest evaluations from his commanders:

> 1 LT Singh is the strongest engineer platoon leader in the battalion. Simmer deployed his Sapper platoon in a route clearance mission during OPERATION ENDURING FREEDOM in support of multiple battlespaces in Regional Command South clearing over 10,000 miles of road. He is an aggressive and meticulous leader who maintained high standards to impressive effect in combat. 1 LT Singh is a solid, unflappable performer who can be counted on in tough positions and arduous missions.

*Id.*

81. In a subsequent Officer Evaluation Report, Captain Singh was "ranked number one of out of seven Officers" by his Company Commander, who also noted that as a "top performer, Simratpal makes any team he is on better. I would fight to serve with Simratpal again." Exhibit 5 (Officer Evaluation Report for Period of Jan. 4, 2013 through Sept. 15, 2013), at 2. His LTC went on to note that CPT Singh's performance "has been nothing short of superb through this rating period," noting that his "ability to thrive in a dynamic and fluid situation make[s] him a vital asset to any team." *Id.*

82. Upon returning from his deployment, and as a result of his "exceptional and meritorious service," Captain Singh was awarded a Bronze Star Medal ("BSM"). Exhibit 6 (Bronze Star Medal Awarded to then-1LT Simratpal Singh). Specifically, Captain Singh was nominated for the Bronze Star for his leadership as patrol leader on "over 170 route clearance patrols throughout Kandahar Province in support of Combined Task Force Lancer," "defense of FOB Frontenac during a coordinated and sustained enemy attack," including leading his platoon to "suppress[] and eventually counterattack[] the heavily armed insurgents." *Id.* at 3.

14

83. Captain Singh also received an Army Achievement Medal in November 2013 for his performance during a joint training exercise with the South Korean Army. Exhibit 7 (The Army Achievement Medal Awarded to then-1LT Simratpal Singh (Nov. 5, 2013)).

84. Captain Singh's exceptional performance continued following his return stateside, where he served as a Brigade Assistant S-4 for a rapidly deployable 4,100 Soldier Stryker Brigade Combat Team. In this role, he was recognized as "easily the best of four captains" that "has proven himself an invaluable asset to the team." Exhibit 8 (Officer Evaluation Report for Period of Sept. 15, 2013, through Sept. 14, 2014), at 1. Captain Singh is viewed as "a top 10% officer" who is a "fit, talented leader with unlimited potential and a bright future." *Id.* at 2.

85. At the same time, Captain Singh received an Army Commendation Medal for his service. Exhibit 9 (Army Commendation Medal (Nov. 17, 2014)).

86. In January 2015, Captain Singh attended and completed the Engineer Captain's Career Course at Fort Leonard Wood while simultaneously volunteering to obtain a Master's Degree in engineering. Exhibit 10 (Certificate of Achievement, U.S. Army Engineer School, FT Leonard Wood, MO (June 26, 2015)).

87. During this time period, he was noted to be a "highly skilled officer" who "displayed great leadership." Exhibit 11 (CPT Simratpal Singh Service School Academic Evaluation Report for Period of Jan. 14, 2015, through June 26, 2015 (June 24, 2015)). It was also noted that "his presence and intellect greatly influenced his peers" and that he is "ready to command a company and will excel in any position of responsibility." *Id.*

88. Last spring, Captain Singh attended the Pentagon's Second Annual Vaisakhi Celebration Event.[11] This event, which celebrated one of the most significant holidays for Sikhs, included Sikh soldiers from various branches of the U.S. military. *Id.* The Pentagon's deputy chaplain, Lieutenant Colonel Claude Brittian, noted the need to "stand up for the rights of others to celebrate in regards to their faith" and stated that Sikh soldiers in the U.S. military "who practice their faith should have the opportunity to share their faith." *Id.*

89. At the event, Captain Singh met several Sikh soldiers who maintain their uncut hair and beards and wear turbans. Further convicted by seeing his fellow U.S. Army soldiers fully practicing their Sikh faith, and for the first time seeing a viable path to obtaining an accommodation, Captain Singh began taking steps towards requesting an exception through his chain-of-command.

90. In mid-October, Captain Singh completed his Master's program and commenced on one-month's leave with orders to report to the 249th Engineer Battalion Prime Power at Fort Belvoir, Virginia, on November 16.

91. Realizing that he needed to return to being fully observant of his Sikh articles of faith, and after religious consideration and consultation, Captain Singh concluded that this was the right time.

92. On October 16, 2015, Captain Singh informed his new immediate commander, Lieutenant Colonel Julie Balten, that he intended to report on November 16 wearing a turban and maintain

---

[11] Lisa Ferdinando, *Pentagon celebrates Sikh new year, Vaisakhi*, Army News Service, May 4, 2015, http://www.army.mil/article/147837/Pentagon_celebrates_Sikh_new_year__Vaisakhi/ (last visited Nov. 24, 2015)

unshorn hair and a beard. She expressed her view that this would have no adverse impact on Captain Singh's ability to fulfill his responsibilities and promised to recommend that he be granted an accommodation.

93. The following day, Captain Singh submitted a letter to then-Secretary of the Army, John McHugh, and to then-Acting General Counsel for the Army, Robert Park, seeking assurance that he would not face disciplinary action as a result of his decision to maintain the Sikh articles of faith.

<u>Effort to Obtain an Accommodation</u>

94. With the understanding that an accommodation was viewed favorably and was being expedited, Captain Singh twice used personal leave to extend his report date, first to November 30 and then to December 14, to give the Army adequate opportunity to respond to his request.

95. On December 8, Defendants issued a thirty-day accommodation, allowing Captain Singh to return to work while the permanent accommodation was presumably being finalized.

96. Then on January 8, Defendants extended the temporary accommodation until March 31.

97. Wishing to proceed in good faith and to avoid legal conflict, and having received no indication that the accommodation would not be made permanent, Captain Singh again agreed to the extension without pursuing a legal remedy.

98. Defendants were well aware that Captain Singh could not wait until the deadline for a final answer on his request for accommodation. Once the temporary accommodation expired, Captain Singh's unshorn hair, turban, and beard would be in violation of the Uniform Code of Military Justice, exposing him to career-ending penalties for living his faith. Through his counsel, Captain

17

Singh thus repeatedly made clear that he would need at least three weeks to seek injunctive relief should the accommodation be denied.

99. Then, on February 24, just over a month before his temporary accommodation expired, Defendants abruptly escalated matters by sending Captain Singh a letter stating he would have to undergo rigorous safety testing because of his religion. Exhibit 16.

100.  With respect to his helmet, Captain Singh was told he would have to be "evaluated" by a "technical expert" to determine whether he could safely "wear a patka" (a religious head covering worn beneath the turban), or whether he must "modify the length" or "bulk" of his hair, which are acts forbidden by his religion. *Id.*

101.  With respect to his safety mask, Captain Singh was told he would have to undergo a series of tests, over multiple days, until he could "achieve a protection factor (PF) greater than 6667 in three of five successive tests." *Id.*

102.  Captain Singh was initially provided contact information for scheduling the evaluations on his own. *Id.*

103.  But on the afternoon of Friday, February 26, he was ordered to report to his normal post for helmet testing the morning of Tuesday, March 1.

104.  Later that evening, around 8:00 PM, he received supplemental orders to report to the Aberdeen Proving Ground in Maryland after his helmet testing for several days of safety mask evaluations.

105.  No other soldiers in even remotely comparable circumstances have been treated in such a discriminatory fashion. No soldiers undergo evaluation for helmet fit. Kalsi Decl. ¶¶ 15-16; Lamba Decl. ¶¶ 21-23.

106.  Rather, soldiers are left to freely try on different helmets and make their own assessment of fit. Kalsi Decl. ¶¶ 15-16; Lamba Decl. ¶¶ 21-23.

107.  Soldiers frequently adjust, remove, or add padding to their helmets on their own, again with no external evaluation, to ensure a personally satisfying fit. Kalsi Decl. ¶ 15; Lamba Decl. ¶ 22.

108.  Captain Singh and others who have served in the Army for years have never even heard of getting an "expert" evaluation of helmet fit. Khalsa Decl. ¶¶ 24-25; Lamba Decl. ¶¶ 22-24.

109.  Even other Sikhs who have recently served in the Army with unshorn hair were never required to undergo evaluations to determine if they could safely wear their helmets.  Kalsi Decl. ¶¶ 13-16; Lamba Decl. ¶¶ 21-23 Khalsa Decl. ¶¶ 24-25.

110.  Similarly, with respect to safety masks, there are no hard-and-fast rules regarding how masks must "fit" for a soldier to be in the Army. The Army's training guidance speaks only in terms of "protective mask confidence," providing that commanders are required to conduct "a mask confidence exercise annually and prior to deployment." AR 350-1, § G-27(*i*).

111. In reality, soldiers may go long periods of time without being subjected to mask-fit evaluations. Before the Wada memo, in his nearly ten years in the Army, Captain Singh had only undergone one mask exercise, and it was not a condition of his employment in the Army.

112.  That exercise comprised sealing his mask, entering a gas chamber, removing the mask for one minute, and then replacing it.

113.  This is consistent with the experience of other soldiers. Lamba Decl. ¶¶ 11-12, 20-23; Kalsi Decl. ¶¶ 11-14; Khalsa Decl. ¶¶ 24-27.

114.  None of the Sikh soldiers with fully grown beards have had any difficulty passing the standard safety mask exercises. Lamba Decl. ¶¶ 11-12, 20-23 (stating that he would go early into the gas chamber and stay longer in it to prove the effectiveness of his protective mask seal); Kalsi Decl. ¶¶ 11-14 (stating that he and other Sikh soldiers successfully passed standard protective mask testing); Khalsa Decl. ¶¶ 24-27 (stating that the Navy permitted sailors cruising at sea to wear beards as long as they were more than one inch, because such beards could maintain an oxygen-mask seal).

115.  None were ever subjected to extensive testing because of their religion. Lamba Decl. ¶¶ 21-23; Kalsi Decl. ¶¶ 11-14; Khalsa Decl. ¶¶ 24-26.

116.  Similarly, soldiers who maintain beards for medical reasons are not subject to any special testing and are not restricted in their duties because of their beards. *See*, *e.g.*, Kalsi Decl. ¶¶ 11-14 (stating that the Special Forces soldiers at his Forward Operating Base in Afghanistan grew out their hair and beards but were not subject to non-standard protective mask testing).

117.  Indeed, the Technical Bulletin for medical specifically provides that a soldier with a medical beard cannot be required to shave, unless his "unit is in, or about to enter, a situation where use of a protective mask is required and where inability to safely use the mask could endanger the Soldier     and     the     unit."     Technical     Bulletin     Med.     287     §     2-6*c*(2),

20

http://armypubs.army.mil/med/DR_pubs/dr_a/pdf/tbmed287.pdf. The Bulletin emphasizes that the authority to force a shave cannot be used "for maneuvers and other tactical simulations. It should only be used when there is an *actual need* to wear the protective mask *in a real tactical operation*." *Id*. § 2-6*b*(2), (emphasis added).

The Army's regulations

118.  The Army's uniform regulations allow soldiers to wear religious headgear while in uniform if the headgear is (1) "subdued in color," (2) "can be completely covered by standard military headgear," (3) "bears no writing, symbols, or pictures," and (4) "does not interfere with the wear or proper functioning of protective clothing or equipment." Army Reg. 600-20, § 5-6*h*(4)(g), http://www.apd.army.mil/pdffiles/r600_20.pdf.

119.  Captain Singh's turban would comply with all these requirements except that a matching turban would replace his standard issue headgear. Captain Singh will wear his unshorn hair neatly wrapped into his turban, well above the edge of his collar.

120.  With respect to facial hair, Army regulations allow sideburns and a mustache as long as they are "neatly trimmed, tapered, and tidy." Army Reg. 670-1, § 3-2*a*(2)(a)-(b), http://www.apd.army.mil/pdffiles/r670_1.pdf.

121.  Although Captain Singh's sideburns, mustache, and beard cannot be trimmed, they would be kept neat and tidy, with his beard tied and tucked close to his face.

   a.  In non-field Garrison settings, Captain Singh will wear a turban made of ACU camouflage material to match his uniform.

   b.  In field settings, Captain Singh will wear a field turban made of ACU camouflage material to match his uniform.

    c.  Captain Singh will wear his Kevlar helmet using the field turban or an ACU-pattern "patka" (small turban).

    d.  In settings where his Class A uniform is appropriate, Captain Singh will wear a black turban to match black standard-issue berets worn with Class A uniforms.

122.  Department of Defense and Army regulations contemplate religious exceptions to the grooming policy. Department of Defense Instruction 1300.17 expressly provides that "the DoD places a high value on the rights of members of the Military Services to observe the tenets of their respective religions." Dep't of Def. Instruction 1300.17(4)(a), http://www.dtic.mil/whs/directives/corres/pdf/130017p.pdf. Thus, it promises that "[r]equests for religious accommodation *will* be resolved in a timely manner and *will* be approved," so long as they do not "adversely affect mission accomplishment, including military readiness, unit cohesion, good order, discipline, and health and safety." Dep't of Def. Instruction 1300.17(4)(e).

123.  The process for obtaining an accommodation, however, is onerous.

124.  In the Army, only a Deputy Chief of Staff at the G-1 level can grant a religious accommodation. Dep't of Def. Instruction 1300.17(4)(f)(2)(a); AR 600-21, § 5-6*i*(1). The request, however, must first be submitted to the soldier's immediate commander, who has no authority to grant or deny uniform and grooming requests, but has "ten working days" to make a recommendation to the G-1. Army Reg. 600-20, § 5-6*i*(2). The soldier must then obtain review by the unit chaplain and legal officer before appealing up through each level of command to the G-1. § 5-6*i*(5)-(7). Each officer up the chain can again make recommendations, but has no authority to grant or deny the request. *Id.* § 5-6*i*(1). Once the first appeal of the chain is submitted, the

regulations allow thirty days for request to make its way up to the G-1. *Id.* § 5-6*i*(11). The G-1 then has another thirty days to make a final decision. *Id.* § 5-6*i*(10).

125.  Thus, depending on how long it takes to obtain the endorsements of unit chaplain and legal officer, it can easily take ninety days or more for the accommodation to be approved.

126.  During this time, the person requesting the accommodation is required to comply with the uniform and grooming regulations, even if doing so violates their religious beliefs. Dep't of Def. Instruction 1300.17(4)(g) ("Service members . . . will comply with the policy, practice, or duty from which they are requesting accommodation . . . unless and until the request is approved."); Army Reg. 600-20, § 5-6*i*(1) (same). But Army policy and Congressional guidance has been trending toward eliminating the requirement that soldiers be forced to violate their faith while accommodation requests are pending. Exhibit 15 (USAREC Message 15-032) (policy allowing incoming soldiers and officers to maintain their articles of faith while awaiting accommodation determinations).

127.  In contrast, soldiers who need a *medical* exception for a beard can get one by having their doctor enter a "permanent profile" in their file, which is only reassessed annually. Techincal Bulletin Med 287 § 2-6*b*(2), http://armypubs.army.mil/med/DR_pubs/dr_a/pdf/tbmed287.pdf.

128.  The Technical Bulletin for medical exceptions acknowledges that "[t]he existence of a beard does not prevent performance of most military duties." *Id.* § 2-6*c*(1).

129. Therefore, the Technical Bulletin continues, "the fact that a profile is awarded authorizing the growth of a beard should not ordinarily require any functional limitations requiring a change or limitation in the performance of military duties." *Id.*

23

130.  A soldier with a medical beard exception cannot be required to shave, unless his "unit is in, or about to enter, a situation where use of a protective mask is required and where inability to safely use the mask could endanger the Soldier and the unit." *Id.* § 2-6*c*(2). This authority cannot be used "for maneuvers and other tactical simulations. It should only be used when there is an actual need to wear the protective mask in a real tactical operation." *Id.*

131.  Since 2007, the Army has authorized "at least 49,690 permanent shaving profiles and 57,616 temporary shaving profiles." *Singh v. McHugh*, 109 F. Supp. 3d 72, 78 (D.D.C. 2015). This includes "not only enlisted men but officers bound to ensure that the men who serve under them are clean-shaven." *Id.*

132.  In the *Singh v. McHugh* litigation, the Army did not "claim[] or show[] that even one of the more than 100,000 soldiers who have been permitted to grow a beard since 2007—including many who have served in deployed environments—have been ordered to shave it for any reason." *Singh*, 109 F. Supp. 3d at 96.

133.  Indeed, the Army admitted that it "does not always enforce grooming policies pertaining to beards" even "when operational necessity requires." *Id.* at 95 n.17.

134.  This flexible treatment is evident from the experience of many Special Forces soldiers who served in Afghanistan while growing full beards.

Other Sikhs in the Army

135.  Captain Singh would not be the first observant Sikh to serve in the military.

136.  Indeed, Sikhs proudly served in the U.S. Army without impediment during the Vietnam War and prior conflicts dating back to World War I.

24

137.  Around 1981, however, military policy was changed to prohibit exemptions to the uniform requirements for visible articles of faith. While some exceptions subsequently were made for the Jewish yarmulke, the general rule was that turban-wearing Sikhs maintaining unshorn hair and beards were disallowed from serving. *See* Dep't of Def. Instruction of Feb, 3, 1988, 1330.17; Army Reg. 600-20 §§ 5-6 (4)(g) (2009) ("The Army does not accommodate exceptions to personal grooming standards for religious reasons . . . .").

138.  On information and belief, many Sikhs who were already in the Army were grandfathered under the 1981 policy change and allowed to continue their service.

139.  One of these soldiers, Colonel Gopal S. Khalsa, served in the Special Forces Unit for ten years on Parachute Status and as a Battalion Commander overseeing an 800-person intelligence group. Khalsa Decl. ¶¶ 12-13, 17. He received a Meritorious Service Medal and Silver Oak Leaf Cluster Award, among many other honors, and in 2004, was inducted into the Officer Candidate School Hall of Fame. Khalsa Decl. ¶¶ 8, 21.

140.  Another Sikh soldier, Sergeant Sevak Singh Kroesen**,** was attached to the Signal Company, 11th Special Forces Group, after which he successfully completed airborne (paratrooper) and Radio Teletype Transmission Operator training. He then completed his Special Forces Qualification Courses and became a Special Forces Communications Sergeant. Sergeant Kroesen subsequently completed his schooling, training, and missions around the world, all with honor and distinction. He was honorably discharged from active duty in 1991.

141.  Sergeant Kirnbir Singh Grewal served in the U.S. Army from 1977 to 1984. Throughout his time in the military, he used the same standard-issue gas mask and helmet as other members

25

of the Army. Indeed, his responsibilities included teaching other soldiers to use protective gear to survive nuclear and biological warfare.

142.   These and other Sikh soldiers served with distinction, all while maintaining their Sikh articles of faith.

143.   Over the last six years, three other Sikhs have been granted religious accommodations, allowing them to serve in the Army with their articles of faith intact.

144.   The first, Corporal Simran Preet S. Lamba, enlisted in August 2010. Fluent in Punjabi and Hindi, he was recruited through the MAVNI program for his cultural and language skills. He served in a medical battalion as a Soldier Medic and was recognized as a "tremendous Soldier" who "had an amazing impact on his peers and supervisors." In June 2014, he received an Army Commendation Medal for his selfless service and dedication to duty. He is currently in the Individual Ready Reserve. Exhibit 12; *see also* Lamba Decl.

145.   Major Tejdeep S. Rattan, a dentist, entered active duty in January 2010 after receiving a religious accommodation. In 2011, he was deployed to Afghanistan where he volunteered to serve in a remote forward operating base. His superiors have noted that he "wears the uniform with pride"; has "[m]ilitary bearing" that is "beyond reproach"; is a "charismatic officer who leads from the front" and "serves as a great mentor for less experienced officers"; and "[i]nspires, motivates, and encourages subordinates." Exhibit 13 (Major Rattan Officer Evaluation Report from 2014).

146.   Finally, Major Kamaljeet S. Kalsi began active duty in June 2010. He was also deployed to Afghanistan in 2011 and was awarded a Bronze Star Medal upon his return for his exceptional service. His superiors have noted that he has "consistently demonstrated a strong commitment to

improving Army Medicine," "exceeded all expectations," and "possesses absolutely unlimited potential as a leader." Exhibit 14 at 2 (Major Kalsi Officer Evaluation Report from 2011). He is currently in the U.S. Army Reserve Officer Corps.

147.  The Sikh articles of faith of these three recently accommodated U.S. Army soldiers in no way impeded their military service—even while deployed abroad in hostile territory.

148.  The government thus has no interest in excluding Sikhs from the U.S. military, much less a compelling one.

**CLAIMS**

**COUNT I**

**Violation of the Religious Freedom Restoration Act
Substantial Burden**

149.  Captain Singh incorporates by reference all preceding paragraphs.

150.  Captain Singh's sincerely-held religious beliefs prohibit him from removing his turban, cutting his hair, or shaving his beard. Captain Singh's compliance with these beliefs is a religious exercise.

151.  The Army's discriminatory testing and regulations expose Captain Singh to serious consequences of military discipline and the loss of his career for his religious exercise.

152.  The Army's discriminatory testing and regulations create government-imposed coercive pressure on Captain Singh to change or violate his religious beliefs.

153.  The Army's discriminatory testing and regulations chill Captain Singh's religious exercise.

154. The Army's discriminatory testing and regulations impose a substantial burden on Captain Singh's religious exercise.

155. The Army's discriminatory testing and regulations do not further a compelling governmental interest as applied to Captain Singh.

156. Applying the Army's discriminatory testing and regulations to Captain Singh is not the least restrictive means of furthering any compelling governmental interest.

157. The Army's discriminatory testing and enforcement of its grooming and personal appearance regulations thus violate rights secured to Captain Singh by the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb, *et seq.*

158. Absent injunctive and declaratory relief, Captain Singh has been and will continue to be harmed.

## COUNT II

**Violation of the First Amendment to the United States Constitution
Free Exercise Clause
Burden on Religious Exercise**

159. Captain Singh incorporates by reference all preceding paragraphs.

160. Captain Singh's sincerely held religious beliefs prohibit him from removing his turban, cutting his hair, or shaving his beard. Captain Singh's compliance with these religious beliefs is a religious exercise.

161. The Army's grooming and personal appearance regulations are not neutral.

162. The heightened testing imposed on Captain Singh is not neutral.

163. The Army's grooming and personal appearance regulations are not generally applicable.

28

164.  The heightened testing imposed on Captain Singh is not generally applicable.

165.  Defendants have created categorical exemptions and individualized exemptions from its grooming and personal appearance regulations.

166.  The Army's discriminatory testing and grooming and personal appearance regulations create government-imposed coercive pressure on Captain Singh to change or violate his religious beliefs.

167.  The Army's discriminatory testing and regulations chill Captain Singh's religious exercise.

168.  The Army's discriminatory testing and regulations expose Captain Singh to substantial consequences for his religious exercise, including military discipline and the loss of his career.

169.  The Army's discriminatory testing and regulations burden Captain Singh's religious exercise.

170.  The Army's discriminatory testing and regulations further no compelling governmental interest.

171.  The Army's discriminatory testing and regulations do not further a compelling governmental interest and are not the least restrictive means of furthering Defendants' stated interests.

172.  The Army's discriminatory testing and its enforcement of its grooming and personal appearance regulations thus violate Captain Singh's rights as secured to him by the Free Exercise Clause of the First Amendment of the United States Constitution.

29

173.  Absent injunctive and declaratory relief against the Army's regulations, Captain Singh has been and will continue to be harmed.

## COUNT III

**Violation of the First Amendment to the United States Constitution**
**Free Exercise Clause**
**Intentional Discrimination**

174.  Captain Singh incorporates by reference all preceding paragraphs.

175.  Captain Singh's sincerely held religious beliefs prohibit him from removing his turban, cutting his hair, or shaving his beard. Captain Singh's compliance with these religious beliefs is a religious exercise.

176.  Historically, the Army has allowed Sikhs to serve in the military with their articles of faith intact.

177.  In the past six years the Army has admitted at least three other observant Sikhs, allowing them to serve in the military without violating their religious convictions.

178.  Defendants subjected Captain Singh to rigorous testing that it has not subjected to any other soldiers, including other observant Sikhs instead of granting him an accommodation.

179.  Despite being informed in detail of Captain Singh's beliefs, Defendants declined to give him an accommodation that would allow him to comply both with his beliefs and the Army's regulations.

180. Defendants have no legitimate basis for denying Captain Singh a religious accommodation.

181.  Defendants denied Captain Singh an accommodation because of his religion.

30

182. Defendants targeted Captain Singh for heightened scrutiny because he requested an accommodation for his religious beliefs.

183. The Army's regulations and the threatened enforcement of the regulations against Captain Singh thus violate his rights under the Free Exercise Clause of the First Amendment of the United States Constitution.

184. Absent injunctive and declaratory relief against the Mandate, Captain Singh has been and will continue to be harmed.

## COUNT IV

### Violation of the First Amendment to the United States Constitution
### Freedom of Speech

185. Captain Singh incorporates by reference all preceding paragraphs.

186. The Army's regulations prohibit Captain Singh from expressing his faith through wearing his turban, wearing uncut hair, and maintaining a beard.

187. The Army's discriminatory testing and regulations place a chilling effect on Captain Singh's speech.

188. The Army's discriminatory testing and regulations constitute content discrimination.

189. The Army's discriminatory testing and regulations constitute viewpoint discrimination.

190. As applied to Captain Singh, the Army's discriminatory testing and grooming and personal appearance regulations are not necessary for good order, discipline or national security and do not satisfy strict scrutiny.

191.  The Army's discriminatory testing and its enforcement of its grooming and personal appearance regulations against Captain Singh thus his rights under the Free Speech Clause of the First Amendment of the United States Constitution.

192.  Absent injunctive and declaratory relief against the Army's regulations, Captain Singh has been and will continue to be harmed.

<u>**COUNT V**</u>

**Violation of the Fifth Amendment to the United States Constitution**
**Due Process**

193.  Captain Singh incorporates by reference all preceding paragraphs.

194.  Free exercise of religion is a fundamental right.

195.  Captain Singh's sincerely held religious beliefs prohibit him from removing his turban, cutting his hair, or shaving his beard. Captain Singh's compliance with these religious beliefs is a religious exercise.

196.  Captain Singh's fundamental right to engage in religious exercise has been burdened by the Army's regulations and its denial of a religious accommodation.

197.  The Army's discriminatory testing and enforcement of its grooming and personal appearance regulations against Captain Singh thus violate his rights under the Due Process Clause of the Fifth Amendment to the United States Constitution.

198.  Absent injunctive and declaratory relief against the Army's regulations, Captain Singh has been and will continue to be harmed.

## COUNT VI

### Violation of the Fifth Amendment to the United States Constitution
### Equal Protection

199.  Captain Singh incorporates by reference all preceding paragraphs.

200.  Other military service members similarly situated to Captain Singh have been granted accommodations for their religious exercise.

201.  The Army accommodates other types of personal expression of other service members.

202.  The Army accommodates the grooming and attire preferences or needs of other service members.

203.  The Army does not make these accommodations subject to heightened levels of testing.

204.  The Army's discriminatory testing and its enforcement of its grooming and personal appearance regulations against Captain Singh thus violate his rights under the Equal Protection Clause of the Fifth Amendment to the United States Constitution.

205.  Absent injunctive and declaratory relief against the Army's regulations, Captain Singh has been and will continue to be harmed.

## COUNT VII

### Violation of the Fifth Amendment to the United States Constitution
### Procedural Due Process

206.  Captain Singh incorporates by reference all preceding paragraphs.

207.  Captain Singh's sincerely held religious beliefs prohibit him from removing his turban or cutting his hair or shaving his beard. Captain Singh's compliance with these religious beliefs is a religious exercise.

33

208.   Enforcement of the Army's regulations against Captain Singh would result in the loss of his livelihood as a soldier and violate his procedural due process rights by wrongfully impairing his property and liberty interests.

209.   Absent injunctive and declaratory relief against the Army's regulations, Captain Singh has been and will continue to be harmed.

## PRAYER FOR RELIEF

Wherefore, Captain Singh requests that the Court:

a.   Declare that the Religious Freedom Restoration Act requires the Army to cease discriminating against Captain Singh and accommodate his religious exercise in maintaining uncut hair and a beard and wearing a turban;

b.   Declare that the First Amendment of the United States Constitution requires the Army to cease discriminating against Captain Singh and accommodate his religious exercise in maintaining uncut hair and a beard and wearing a turban.

c.   Declare that the Fifth Amendment of the United States Constitution requires Defendants to cease discriminating against Captain Singh and accommodate Captain Singh's religious exercise in maintaining uncut hair and a beard and wearing a turban.

d.   Issue a permanent injunction (1) enjoining Defendants from subjecting Captain Singh to non-standard, discriminatory testing; (2) enjoining Defendants from enforcing the Army's grooming and personal appearance regulations against Captain Singh insofar as they require him to cut his hair, shave his beard, or cease wearing his turban; (3) ordering Defendants to permit Captain Singh to continuing serving in the Army

34

without regard to his unshorn hair and beard and a turban; and (4) ordering that the injunction will apply to all Army posts that Captain Singh will hold in the future, unless the Army makes an individualized showing of a compelling governmental interest that cannot be satisfied by less restrictive means;

e.   Nominal damages.

f.   Award Captain Singh the costs of this action and reasonable attorney fees; and

g.   Award such other and further relief as it deems equitable and just.

**JURY DEMAND**

Captain Singh requests a trial by jury on all issues so triable.


Respectfully submitted this 29th day of February, 2016.


Eric S. Baxter (D.C. Bar No. 479221)
Eric C. Rassbach (D.C. Bar No. 493739)
Diana M. Verm (D.C. Bar No. 1811222)
Daniel Blomberg (*pro hac vice* pending)
The Becket Fund for Religious Liberty
1200 New Hampshire Ave. NW, Suite 700
Washington, DC 20036
(202) 955-0095
(202) 955-0090
ebaxter@becketfund.org

Amandeep S. Sidhu (D.C. Bar No. 978142)
Emre N. Ilter (D.C. Bar No. 984479)
McDermott Will & Emery LLP
500 North Capitol Street, N.W.
Washington , DC, 20001
(202) 756-8000 PHONE
(202) 756-8087 FAX
*asidhu@mwe.com*

Harsimran Kaur Dang (D.C. Bar No. 493428)
Gurjot Kaur (*pro hac vice* pending)
The Sikh Coalition
50 Broad Street, Suite 1537
New York, NY, 10004
(212) 655-3095 PHONE
*harsimran@sikhcoalition.org*

*Counsel for Plaintiff*

36

**VERIFICATION OF COMPLAINT ACCORDING TO 28 U.S.C. § 1746**

I, Simrtapal Singh, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on February 28, 2016

Simratpal Singh*

*I certify that I have the signed original of this document, which is available for inspection at any time by the Court or a party to this action.