## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SIMRATPAL SINGH,<br><br>Plaintiff,<br><br>v.<br><br>ASHTON B. CARTER, *in his official capacity as Secretary of Defense, et al.*,<br><br>Defendants. | Civil Action No. 16-399 (BAH)<br><br>Judge Beryl A. Howell |

## <u>MEMORANDUM OPINION</u>

Pending before the Court is a motion for a temporary restraining order to enjoin an order from the United States Army's senior command to the plaintiff, Captain Simratpal Singh, a decorated Sikh Army officer, requiring him to undergo several days of specialized testing, under expert supervision, at a cost of over $32,000, with his "army combat helmet" and "army protective mask" for the purpose of ensuring that his Sikh articles of faith, namely a cloth head covering and unshorn hair and beard, will not interfere with the helmet's ability "to withstand ballistic and blunt forces" and the mask's ability "to provide protection from toxic chemical and biological agents."  At first blush, the challenged order appears to reflect a reasonably thorough and even benevolent decision by the Army to fulfill its duty of protecting the health and safety of this particular Sikh officer.

Yet, that is far from the complete picture.  Thousands of other soldiers are permitted to wear long hair and beards for medical or other reasons, without being subjected to such specialized and costly expert testing of their helmets and gas masks.  Moreover, other Sikh soldiers have been permitted to maintain their articles of faith without such specialized testing. In fact, just this week, the plaintiff, who maintains the Sikh articles of faith, passed the standard

1

gas mask test administered to his unit and given routinely to soldiers.  Nonetheless, the plaintiff has been ordered to undergo additional specialized testing as part of the Army's review of his request for a religious accommodation and exception to the Army's regulations regarding grooming and appearance.  As the Supreme Court has stressed, in evaluating claims of discriminatory governmental action implicating the important First Amendment right to the Free Exercise of religion, "context matters."  *Cutter v. Wilkinson*, 544 U.S. 709, 723 (2005) (quoting *Grutter v. Bollinger*, 539 U.S. 306, 327 (2003)); *see Holt v. Hobbs*, 135 S. Ct. 853, 867 (2015) (Sotomayor, J., concurring) ("Nothing in the Court's opinion calls into question our prior holding in *Cutter v. Wilkinson* that 'context matters' in the application of [statutes protecting religious exercise] . . . .").

Courts should be reluctant, as the defendants point out, "to interfere with legitimate Army matters," *Kreis v. Sec'y of Air Force*, 866 F.2d 1508, 1511 (D.C. Cir. 1989) (quoting *Orloff v. Willoughby*, 345 U.S. 83, 93–94 (1953)), since "great deference" should be given "to the professional judgment of military authorities concerning the relative importance of a particular military interest," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (quoting *Goldman v. Weinberger*, 475 U.S. 503, 507 (1986)); *see also Chappell v. Wallace*, 462 U.S. 296, 300 (1983) ("Civilian courts must, at the very least, hesitate long before entertaining a suit which asks the court to tamper with the established relationship between enlisted military personnel and their superior officers; that relationship is at the heart of the necessarily unique structure of the military establishment."); *New v. Cohen*, 129 F.3d 639, 643 (D.C. Cir. 1997) ("[T]he military justice system must remain free from undue interference, because the military is a specialized society separate from civilian society with laws and traditions of its own developed during its long history." (internal quotation omitted) (quoting *Schlesinger v. Councilman*, 420 U.S. 738,

757 (1975)).  At the same time, the Supreme Court "has never held . . . that military personnel are barred from all redress in civilian courts for constitutional wrongs suffered in the course of military service," *Chappell*, 462 U.S. at 304, and "military interests do not always trump other considerations," *Winter*, 555 U.S. at 26.  The context of this case raises such significant questions about the lawfulness of the Army command's order to the plaintiff to undergo specialized testing that, pursuant to the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. §§ 2000bb, *et seq.*, judicial intervention is required.

## I.      BACKGROUND

The plaintiff is an honors West Point graduate, with an advanced Master's degree in engineering, a Ranger, and a Bronze Star recipient for his service while being forward-deployed to Operation Enduring Freedom in Kandahar Province, Afghanistan.  Verified Compl. ("Compl.") ¶¶ 76, 79, 82, 90, ECF No. 1; Compl. Ex. 2 (West Point academic record), ECF No. 1-1; Compl. Ex. 6 (Bronze Star Medal documentation), ECF No. 1-1.  He is also a practicing Sikh, Compl. ¶¶ 46–56, a religion that requires him to wear external "articles of faith," including unshorn hair (*kesh*), a beard, and a turban (*dastaar*) or smaller traditional cloth head covering (*patka*), *id.* ¶¶ 2–4, 36–42, 100.  As a Captain in the United States Army, the plaintiff is bound by the Uniform Code of Military Justice, which requires hairstyle and grooming standards in conflict with his faith.  *See generally* U.S. Dep't of Army, Reg. 670–1, Wear and Appearance of Army Uniforms and Insignia (Apr. 10, 2015).

Throughout his youth, the plaintiff maintained the Sikh articles of faith, wearing a turban and never cutting his hair or shaving.  Compl.  ¶¶ 47–50.  Upon graduation from high school, however, the plaintiff, who long desired to serve in the military, attained the opportunity to attend the United States Military Academy at West Point.  *Id.* ¶¶ 67–70.  Before his induction

into West Point, the plaintiff inquired about obtaining a religious accommodation for his articles of faith from Army personnel who "expressed doubt" and "gave vague responses." Pl.'s Combined Mem. Supp. Appl. TRO & Appl. Prelim. Inj. ("Pl.'s Mem.") at 8–9, ECF No. 2-1; *see* Compl. ¶¶ 69–70. During the induction process, "and before Captain Singh fully understood what was happening, he found himself in the barbershop with the other cadets to be trimmed and shaved." Compl. ¶ 71. "[B]elieving he had no other option" but to risk losing the opportunity to attend West Point and serve this country, the plaintiff "succumbed under pressure and made the difficult decision to remove his turban, cut his hair, and shave his beard." *Id.* ¶ 72.

Though "[e]xperiencing significant shame and disappointment in himself" for violating the Sikh religious requirements, *id.* ¶ 74, the plaintiff graduated from West Point in 2010 with a B.S. degree in electrical engineering with Honors, *id.* ¶ 76; *see* Compl. Ex. 2, and, thereafter, has continuously served this country with notable excellence. He has received high praise from his commanders, Compl. ¶¶ 78, 80–81, attended and graduated from Ranger School, *id.* ¶¶ 78–79, and served as platoon leader in a deployment to Afghanistan from April 2012 to January 2013, *id.* ¶¶ 79–80, for which "exceptional and meritorious service" the plaintiff was awarded a Bronze Star Medal, *id.* ¶ 82; *see* Compl. Ex. 6. In November 2013, the plaintiff received an Army Achievement Medal for his performance during a joint training exercise with the South Korean Army, Compl. ¶ 83; *see* Compl. Ex. 7 (Army Achievement Medal documentation), ECF No. 1-1, and, in November 2014, he received an Army Commendation Medal for his service as a Brigade Assistant for a "rapidly deployable . . . Combat Team," Compl. ¶¶ 84–85; *see* Compl. Ex. 9 (Army Commendation Medal documentation), ECF No. 1-1.

In the Spring of 2015, the plaintiff met several Sikh soldiers who maintain their articles of faith at a celebration of the Sikh New Year hosted by the Pentagon and, "for the first time," saw "a viable path" to obtaining a religious accommodation.  Compl. ¶¶ 88–89.

Later that year, on October 16, 2015, around the time the plaintiff completed a Master's degree in engineering and began a one-month leave, the plaintiff informed his new immediate commander, Lieutenant Colonel ("LTC") Julie Balten, that he intended to report to his next-ordered post, the 249th Engineer Battalion Prime Power at Fort Belvoir, Virginia, on the date ordered, November 16, 2015, donning his articles of faith—wearing a turban, unshorn hair, and a beard.  Id. ¶¶ 90–92.  LTC Balten represented to the plaintiff that his articles of faith "would have no adverse impact on [his] ability to fulfill his responsibilities and promised to recommend that he be granted an accommodation."  Id. ¶ 92.  Shortly thereafter, on October 21, 2015, the plaintiff submitted a "Request for Religious Accommodation and Exception to Wear and Appearance Regulations Pursuant to AR 600-20 and AR 670-1" ("Pl.'s Request"), Defs.' Opp'n to Pl.'s Mot. TRO ("Defs.' Opp'n"), Appendix ("Defs.' App.") at A19, Pl.'s Request at 1, ECF No. 9-1, pursuant to Army Regulation 600-20, which provides that "[i]n accordance with [RFRA] . . . , the Army will approve requests for accommodation of religious practices unless accommodation will have an adverse impact on unit readiness, individual readiness, unit cohesion, morale, good order, discipline, safety, and/or health," U.S. Dep't of Army, Reg. 600–20, Army Command Policy (Nov. 6, 2014), ch. 5–6(a).  In his request, the plaintiff detailed how he would "conform [his] religious requirements in a way that ensures consistency with the Army's need to maintain uniformity and safety standards," including maintaining his "hair and beard in a neat and conservative manner at all times;" wearing a turban in non-field and field settings in a matching camouflage material to his uniform, or a "subdued black turban with the

Class A uniform whenever required;" and wearing a *patka* or small turban with his Kevlar helmet.  Pl.'s Request at 2–3.

Due to delays in receiving any response to this religious accommodation request, the plaintiff twice used personal leave to extend his report date to December 14, 2015.  Compl. ¶ 94. Finally, on or about December 9, 2015, Debra S. Wada, the Assistant Secretary of the Army ("ASA") for Manpower and Reserve Affairs since October 2014, who is "responsible for overseeing the implementation and execution of the Army's policy for accommodating religious practices and ensuring compliance with the law and DoD policy regarding religious practices," Defs.' App. at A1, Decl. of Debra S. Wada (Feb. 29, 2016) ("Wada Decl.") ¶ 1, issued a temporary, "interim accommodation" to the plaintiff granting him permission to wear his articles of faith until January 8, 2016, at which time ASA Wada indicated she would provide the plaintiff with a final decision, Defs. App. at A18; *see* Compl. ¶ 95.  On January 8, 2016, ASA Wada extended the plaintiff's interim accommodation until March 31, 2016, "at which time [she] expect[s] to provide [the plaintiff] with [her] decision."  Defs.' App. at A17; *see* Compl. ¶ 96.

On February 23, 2016, ASA Wada requested "additional information concerning the compatibility of [the plaintiff's] turban, hair, and beard with U.S. Army protective equipment." Defs.' App. at A14, Mem. from Debra S. Wada (Feb. 23, 2016) ("Wada Mem.") ¶ 2; Compl. Ex. 16 (Wada Mem.) ¶ 2, ECF No. 1-1.  To gather the requested "additional information," ASA Wada ordered the plaintiff, first, to be fitted with an Army Combat Helmet ("ACH") "by a technical expert," who "should evaluate whether CPT Singh can safely wear a patka under the ACH" and "determine whether and to what extent CPT Singh must modify the length, bulk, or placement of his hair in order to obtain a proper fit and to ensure the head protection coverage area is not reduced."  Wada Mem. ¶ 3.  ASA Wada ordered the plaintiff then "to be fitted with a

protective mask by a technical expert" and evaluated using a corn oil aerosol test, *id.* ¶ 4(a), one

of three types of mask evaluation procedures used by the Army, Defs.' App. at A6, Decl. of Alex

G. Pappas (Feb. 29, 2016) ("Pappas Decl.") ¶ 3.  ASA Wada ordered the plaintiff to undergo the

corn oil aerosol test using four types of Army masks, each under two different types of

conditions:  first, "without any type of gel, oil, or lotion" in the plaintiff's hair or beard and, if

the plaintiff cannot achieve a certain level of protection "in three of five successive tests" with

any mask, second, with "a personally-procured hair gel or product, such as Vaseline, to further

conform his hair to the contours of his face."  Wada Mem. ¶ 4(a)–(b).  ASA Wada requested the

testing results be provided to her prior to March 15, 2016, "[t]o facilitate timely action" on the

plaintiff's religious accommodation request.  *Id.* ¶ 6.

      The plaintiff was advised of ASA Wada's memorandum requiring him to undergo the

specialized testing the following day.  Decl. of Simratpal Singh Supp. TRO / Mot. Prelim. Inj.

(Mar. 1, 2016) ("Pl.'s Decl.") ¶ 3, ECF No. 16-2.  On the afternoon of Friday, February 26,

2016, the plaintiff was ordered to report to his normal duty post for helmet testing on the

morning of March 1, 2016, and for the "comprehensive individual gas mask testing" later this

same week.  *Id.* at ¶ 9; Compl. ¶ 103; Pl.'s Mem. at 13; Defs.' Opp'n at 3.  Later in the evening

of February 26, 2016, the plaintiff was ordered by his immediate commanding officer, LTC

Balten, to report, after the March 1, 2016 helmet testing, to Aberdeen Proving Ground in

Maryland for three days of safety-mask testing, which LTC Balten indicated would cost

approximately $33,000.  Pl.'s Decl. ¶ 10; Defs.' Notice, Ex. at 3, ECF No. 13 (Feb. 26, 2016

email from Colonel ("COL") Michael Peloquin to COL Peter Helmlinger, stating that the gas

mask test "[i]nvolves 3 days of testing at a cost of $32,925" and noting concern about

completion date "if ECBC [the testing center] must conduct significant analysis in the

development of its test report"). She also told the plaintiff that her commanding officer wanted

the plaintiff to be escorted to the Aberdeen Proving Ground from Fort Belvoir, a circumstance

normally associated with "soldiers they mistrust." Pl.'s Decl. ¶ 12; *see* Defs.' Notice, Ex. at 2

(Feb. 26, 2016 email from COL Helmlinger to LTC Balten, stating "I recommend you also send

a more senior escort from the 249th to travel with [plaintiff] and observe the training" and, if he

is sent "on his own," directing LTC Balten to "provide him with very clear written

counseling/instructions as to the purpose of the protective mask testing and his requirements to

comply with the experts"). LTC Balten was subsequently advised that her commanding officer

had been advised by "USACE Chief Counsel" that verbal, rather than written instructions would

be sufficient. Defs.' Notice, Ex. at 1 (Feb. 26, 2016 email from COL Helmlinger to LTC

Balten).

On the morning of February 29, 2016, the plaintiff participated with about 30 soldiers

from his unit in a previously scheduled standard gas mask test, in which the soldiers put on their

gas masks and then entered a chamber to perform exercises while noxious gas was released.

Pl.'s Decl. ¶¶ 13–15. The plaintiff successfully completed the test with his gas mask sealed and

resealed. *Id.* ¶¶ 16–17.

The same day that the plaintiff was participating in the standard gas mask test, he filed

the Verified Complaint in this case along with an Application for Temporary Restraining Order

("TRO"), ECF No. 2, seeking to prohibit the defendants "from subjecting Captain Singh to the

protective mask test or helmet test requirements set forth in the February 23, 2016 memorandum

from Debra S. Wada or any other unusual or discriminatory testing," Pl.'s Proposed TRO Order,

ECF No. 2-5, and an Application for Preliminary Injunction, ECF No. 3, seeking to "direct

Defendants to grant [plaintiff] a permanent religious accommodation that would allow him to

wear uncut hair, a bear, and a turban, as required by his Sikh faith, while serving in the Army,"

Pl.'s App. for Prelim. Inj., ECF No. 3; *see also* Pl.'s Proposed Prelim. Inj. Order, ECF No. 3-1

(seeking to enjoin defendants "from enforcing against Plaintiff any Army regulations that would

prohibit him from wearing unshorn hair, a beard, and turban as required by his Sikh faith").

Given that the specialized testing ordered by ASA Wada was to begin the following morning, the

Court promptly held a hearing on the TRO application that afternoon. *See* Minute Entry (Feb.

29, 2016). At the hearing, the defendants agreed to postpone the specialized testing until March

4, 2016.

## II.    LEGAL STANDARD

The standard for a temporary restraining order is the same as that for preliminary

injunction. *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C.

Cir. 1977); *see Experience Works, Inc. v. Chao*, 267 F.Supp.2d 93, 96 (D.D.C. 2003). Either

type of injunctive relief "is an extraordinary and drastic remedy," and "should not be granted

unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*,

520 U.S. 968, 972 (1997) (emphasis omitted) (quoting 11A CHARLES ALAN WRIGHT, ARTHUR R.

MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2948 (2d ed. 1995)). The

plaintiff is required to show clearly four things: (1) that he is "likely to succeed on the merits,"

(2) that he is "likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the

balance of equities tips in his favor," and (4) "that an injunction is in the public interest."

*Glossip v. Gross*, 135 S. Ct. 2726, 2736–37 (2015) (quoting *Winter*, 555 U.S. at 20); *see also*

*Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (quoting *Sherley v. Sebelius*, 644 F.3d

388, 392 (D.C. Cir. 2011)). The plaintiff must "show that all four factors, taken together, weigh

in favor of the injunction." *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014) (quoting

*Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009)).  The Supreme

Court in *Winter* made clear that a court may not issue "a preliminary injunction based only on a

possibility of irreparable harm . . . [since] injunctive relief [i]s an extraordinary remedy that may

only be awarded upon a clear showing that the plaintiff is entitled to such relief."  555 U.S. at 22.

## III.   DISCUSSION

Two motions for injunctive relief are pending in this case, *see* Appl. for TRO, ECF No. 2;

Appl. for Prelim. Inj., ECF No. 3, but only the motion for a temporary restraining order is fully

briefed and, thus, ripe for review.[1]  After considering the defendants' justiciability concerns, the

---

[1]       At the oral hearing held on February 29, 2016, and throughout their papers, the defendants argue that the issue presented in the motion for preliminary injunction will not be justiciable until the defendants make a final determination on the plaintiff's request for religious accommodation which, if granted, would render that motion moot.  *See, e.g.*, Defs.' Proposed Briefing Schedule at 1, ECF No. 17; Tr. of Hr'g for TRO (Feb. 29, 2016) ("Hr'g Tr.") at 59–61, ECF No. 20.  Additionally, the defendants argue that the specialized helmet and gas mask testing must be conducted in order for ASA Wada to make a final decision on the plaintiff's request.  *See, e.g.*, Defs.' Opp'n at 10, ECF No. 9.  The plaintiff, on the other hand, "strongly believes that this Court has the authority to immediately decide his requests for both" a temporary restraining order barring the specialized testing and a preliminary injunction granting the plaintiff's request for a religious accommodation.  Pl.'s Proposed Briefing Schedule at 1–2, ECF No. 14.  Accordingly, the plaintiff proposed an accelerated briefing schedule that would have allowed the Court to resolve both motions this week.  *Id.*
          The defendants objected to the plaintiff's proposed briefing schedule, proposing an alternative briefing schedule for the preliminary injunction motion to take place in April 2016, *see generally* Defs.' Proposed Briefing Schedule, to which proposal the plaintiff does not object so long as "further emergency proceedings" are avoided, Pl.'s Resp. Defs.' Proposed Briefing Schedule ("Pl.'s Resp.") at 1, ECF No. 19.  In support of their alternative proposed briefing schedule, and to address the Court's concern expressed at the hearing about avoiding another rushed "fire drill" consideration of the weighty First Amendment issues at stake, the defendants assured the Court that, "should Plaintiff's longer-term accommodation request not be granted when his temporary accommodation expires on March 31, 2016, Plaintiff will initially receive a 21-day extension of his current accommodation, prior to requiring Plaintiff to comply with Army grooming standards."  Defs.' Proposed Briefing Schedule at 3.  The defendants' assurance is notably silent as to whether the 21-day extension would be granted regardless of the outcome of the TRO motion, raising the specter that the plaintiff's request for religious accommodation may be denied and his temporary accommodation withdrawn at any time after resolution of the TRO motion against the defendants.  Consequently, the plaintiff "agrees to extend the briefing schedule for the application for preliminary injunction only on condition that (1) Defendants confirm in writing that Captain Singh's temporary accommodation is extended until a final decision is rendered on the pending application for preliminary injunction, including any appeals; and (2) Defendants confirm in writing that they will issue a final decision on Captain Singh's request for a permanent accommodation by March 31, 2016, regardless of this Court's ruling on the pending application for a TRO."  Pl.'s Resp. at 2.  Despite the defendants' silence, the 21-day extension of the plaintiff's current accommodation is presumably not conditioned on the denial of the TRO but would also apply if the TRO is granted, since the same conditions would exist in either circumstance.  Indeed, otherwise, the defendants' risk the perception that refusing to extend the plaintiff's temporary accommodation, if the TRO is granted, during consideration of the preliminary injunction application is in some way retaliatory, and thereby coercive, against the plaintiff for his attempt to enforce his religious rights.

Court turns to analysis of whether the plaintiff has satisfied the four requisite elements for the TRO he seeks.

### A.    Threshold Jurisdictional Question

As a threshold matter, the defendants characterize the plaintiff's challenge to the order for him to undergo specialized helmet and gas mask testing procedures as a "disagreement with the orders of his superiors." Defs.' Opp'n at 4; *id*. at 5 ("[This] is nothing more than Plaintiff's disagreement about the wisdom of an order issued to him."). As such, the defendants contend that the specialized testing order is "a purely internal military affair" that "is outside the bounds of this court's jurisdiction," for two inter-related reasons. *Id.* at 5–6.

First, the defendants contend that the specialized testing order "implicates unique demands of military discipline – that an officer follow the lawful orders of his superiors." *Id.* at 6. Any judicial interference that "allow[s] a Soldier to second guess an order of his superior" may, "by design[,] effect[] the goals of discipline and obedience." *Id.* at 7 (internal quotation and citation omitted).

Second, the defendants point out that, due to the potential adverse effect of judicial intervention on critical military discipline and order, "absent a clearly defined right enforceable in a proceeding other than a court-martial—for example, an administrative proceeding to address a service member's conscientious objector status—the federal courts normally should not interfere with day-to-day operations of the military services as Plaintiff requests this Court to do." *Id.* (citing *New*, 129 F.3d at 647). In other words, the defendants urge the Court to abstain from reviewing the legality of the specialized testing order, leaving the plaintiff with the choice "to disobey the order" and be "subject to discipline," which would then enable him to "present

his arguments about the legality of his orders as a defense to the court-martial action" or bring

claims in an administrative proceeding.  *Id.*  These arguments are not persuasive.

Indisputably, "'the complex, subtle, and professional decisions as to the composition,

training, equipping, and control of a military force'" is vested "exclusively in the legislative and

executive branches."  *Kreis*, 866 F.2d at 1511 (quoting *Gilligan v. Morgan*, 413 U.S. 1, 10

(1973)).  These other two branches of the federal government are plainly responsible "for setting

up channels through which . . . grievances" for complaints of "discrimination, favoritism or other

objectionable handling of men" in the military "can be considered and fairly settled."  *Orloff*,

345 U.S. at 93–95 (holding the military had exclusive jurisdiction to determine the propriety of

an Army inductee's "specific assignments to duty"); *Kreis*, 866 F.2d at 1511 (holding Air Force

major's "request for retroactive promotion" was a "nonjusticiable military personnel decision[]"

because "Congress has vested in the Secretary alone the authority to determine" the propriety of

promotion decisions).

Yet, despite the sound reasons for limits on judicial review and requirements of

administrative exhaustion of military personnel decisions generally, "resolving a claim founded

solely upon a constitutional right is singularly suited to a judicial forum and clearly inappropriate

to an administrative board."  *Adair v. England*, 183 F. Supp. 2d 31, 55 (D.D.C. 2002) (quoting

*Downen v. Warner,* 481 F.2d 642, 643 (9th Cir. 1973)).  Thus, in *Adair*, the Court rejected the

military's argument that plaintiffs, non-liturgical Naval chaplains, who brought claims "based on

the First Amendment's Establishment and Free Exercise Clauses and the Fifth Amendment's

Due Process Clause," should have "first exhausted their administrative remedies by raising their

personnel claims with the Board for Correction of Naval Records ('BCNR') before coming to

federal court."  *Id.*

Indeed, "the Supreme Court and [the D.C. Circuit] have heard numerous [constitutional] challenges to military policies." *Brannum v. Lake*, 311 F.3d 1127, 1130 (D.C. Cir. 2002). The D.C. Circuit has explained that the logic underlying nonjusticiability in military cases is "wholly inappropriate . . . when a case presents an issue that is amenable to judicial resolution," recognizing that "courts have shown no hesitation to review cases in which a violation of the Constitution, statutes, or regulations is alleged." *Dilley v. Alexander*, 603 F.2d 914, 920 (D.C. Cir. 1979); *see id.* ("It is a basic tenet of our legal system that a government agency is not at liberty to ignore its own laws and that agency action in contravention of applicable statutes and regulations is unlawful. . . . The military departments enjoy no immunity from this proscription." (citation omitted)).[2]

The plaintiff here challenges whether the specialized testing order of his superiors is in fact "lawful," Defs.' Opp'n at 4, by pursuing his "clearly defined right enforceable in a proceeding other than a court-martial," *id*. at 5, under RFRA. This statute was enacted "in 1993 in order to provide very broad protection for religious liberty," in response to a 1990 Supreme Court decision—*Employment Division v. Smith*, 494 U.S. 872 (1990)—that limited religious liberty by "largely repudiat[ing]" the Court's earlier "method of analyzing free-exercise claims." *Burwell v. Hobby Lobby Stores, Inc. (Hobby Lobby)*, 134 S. Ct. 2751, 2760 (2014); *see Smith*, 494 U.S. at 888 (expressing concern about "open[ing] the prospect of constitutionally required

---

[2]       The defendants' reliance on *New* and *Schlesinger* is misplaced. Both of those cases involved Army solders' requests for collateral review, via a habeas petition, of a pending court-martial disciplinary proceeding. *See Schlesinger*, 420 U.S. at 748–49; *New*, 129 F.3d at 643–44. *New* even recognized that when a soldier chooses to obey an order he believes is unlawful, he can seek direct judicial review of the military's policies. 129 F.3d at 647. It is only when a soldier chooses to disobey the order that he must "challenge the[] validity in the subsequent disciplinary proceedings." *Id. New* further recognized that when a plaintiff has "a clearly defined right enforceable in a proceeding other than a court-martial" proceeding, federal courts may intervene. *Id. Cf. Schlesinger*, 420 U.S. at 758 ("hold[ing] that when a serviceman charged with crimes by military authorities can show no harm other than that attendant to resolution of his case in the military court system, the federal district courts must refrain from intervention, by way of injunction or otherwise").

religious exemptions from civic obligations of almost every conceivable kind").  In enacting

RFRA, Congress found, *inter alia*, that "governments should not substantially burden religious

exercise without compelling justification" and rejected the Supreme Court's elimination in *Smith*

of "the requirement that the government justify burdens on religious exercise imposed by laws

neutral toward religion," concluding that "the compelling interest test as set forth in prior Federal

Court rulings is a workable test for striking sensible balances between religious liberty and

competing prior governmental interests."  42 U.S.C. § 2000bb(a).  Congress expressly stated that

the "purposes" of RFRA are to "guarantee [the] application" of "the compelling interest test . . .

*in all cases* where free exercise of religion is substantially burdened" and "to provide a claim or

defense to persons whose religious exercise is substantially burdened by government."  42

U.S.C. § 2000bb(b) (emphasis added).  RFRA, in fact, "provided even broader protection for

religious liberty than was available" under the decisions it sought to restore.  *Hobby Lobby*, 134

S. Ct. at 2761 n.3.

      Thus, RFRA provides both broad protection of the free exercise right and a broad right of

action for judicial relief.  *See* 42 U.S.C. § 2000bb-1(c) ("A person whose religious exercise has

been burdened in violation of this section may assert that violation as a claim or defense in a

judicial proceeding and obtain appropriate relief against a government.").  Notably, Congress

nowhere inserted any exception for the U.S. Armed Forces from RFRA's application or any

exhaustion requirement, as it did, for example, in RFRA's "sister statute," the Religious Land

Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. §§ 2000cc, *et seq.  See

Holt*, 135 S. Ct. at 859; *Cutter*, 544 U.S. at 723 n.12 ("[A] prisoner may not sue under RLUIPA

without first exhausting all available administrative remedies." (citing 42 U.S.C. §§ 1997e(a),

2000cc-2(e))); *see also Oklevueha Native Am. Church of Hawaii, Inc. v. Holder*, 676 F.3d 829,

14

838 (9th Cir. 2012) ("We decline . . . to read an exhaustion requirement into RFRA where the statute contains no such condition, . . . and the Supreme Court has not imposed one."). Consequently, RFRA certainly provides no textual support for the defendants' position that the plaintiff is required to exhaust administrative remedies in a court-martial proceeding before bringing his constitutional and RFRA claims before this Court.

Accordingly, the Court is satisfied that jurisdiction over the plaintiff's claims is properly exercised here.

### B.    Likelihood of Success on the Merits

In his application for a TRO, the plaintiff contends that he has a likelihood of success on his claims that the specialized testing violates:  (1) the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. §§ 2000bb, *et seq*., (2) the Free Exercise Clause of the First Amendment of the United States Constitution, and (3) the Equal Protection Clause of the Fifth Amendment of the United States Constitution.  Pl.'s Mem. at 23, 37–40.  For the following reasons, the Court finds that the plaintiff has demonstrated a likelihood of success on his RFRA claim and, thus, does not address his likelihood of success on the other claims.

RFRA provides that the "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" unless "it demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000bb-1(a), (b).  At the preliminary injunction stage, the parties' burdens of proof and persuasion under RFRA "track the burdens at trial."  *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006).

15

Thus, the plaintiff bears the initial burden of showing that the government's policy "implicates his religious exercise"—*i.e.*, that "the relevant exercise of religion is grounded in a sincerely held religious belief"—and that the government's policy substantially burdens that exercise of religion. *Holt*, 135 S. Ct. at 862; *O Centro*, 546 U.S. at 428 (noting that the plaintiff's *prima facie* case under RFRA is to show that the application of the government's policy "would (1) substantially burden (2) a sincere (3) religious exercise"). The burden then shifts to the defendants to show that the policy "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a); *Holt*, 135 S. Ct. at 863; *see* 42 U.S.C. § 2000bb-2(3) ("[T]he term 'demonstrates' means meets the burdens of going forward with the evidence and of persuasion."); *O Centro*, 546 U.S. at 428–29 (explaining that it is the government's burden (of proof and persuasion) at the preliminary injunction stage to "demonstrate that the application of the burden [of free exercise] to the [plaintiff] would, more likely than not, be justified by the asserted compelling interests" and that the plaintiff's "proposed less restrictive alternatives are less effective" (citing *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004)).

### 1.      *The Plaintiff Has Established A Prima Facie Case*

The defendants do not dispute the sincerity of the plaintiff's exercise of his Sikh religious beliefs. *See* Tr. of Hr'g for TRO (Feb. 29, 2016) ("Hr'g Tr.") at 34:15–16, ECF No. 20. The defendants dispute that the specialized helmet and gas mask testing required of the plaintiff poses any burden on his free exercise right because all of the "testing would be completed with CPT Singh's articles of faith intact." Defs.' Opp'n at 8–9. This view of the burden on the plaintiff is too myopic and ignores both the fact that the plaintiff is required to take these tests when other

soldiers granted exceptions to the Army regulations regarding grooming and appearance are not, and the fact that these tests directly affect whether the plaintiff receives a religious accommodation and, if granted, the scope of the accommodation.  *See* Wada Decl. ¶ 5 (asserting that the Army must conduct the "individualized testing" on the plaintiff to "understand [safety] risks to the greatest extent possible before making a final decision on CPT Singh's religious accommodation and, if he is granted an accommodation, the scope of that accommodation").

The issue before this Court on the TRO application is not whether compliance with the Army grooming and appearance regulations would substantially burden the plaintiff's religious exercise rights.  In that regard, the plaintiff's *prima facie* case may be "easily satisfied" since, absent an accommodation, the plaintiff would face serious disciplinary action by maintaining the Sikh articles of faith, *see Holt*, 135 S.Ct. at 862 (concluding that prison grooming policy on beard length "substantially burdens [prisoner plaintiff's] religious exercise" because if he "contravenes that policy and grows his beard, he will face serious disciplinary action"), a finding conceded by the defendants, *see* Hr'g Tr. at 34:17–35:5 (conceding that, should the Army revoke the plaintiff's interim religious accommodation, he would be substantially burdened and have a right of action under RFRA).  Rather, the issue now is whether conditioning the processing of the plaintiff's request for a religious accommodation on the specialized helmet and gas mask testing itself presents a substantial burden.

Generally, "[a] substantial burden exists when government action puts 'substantial pressure on an adherent to modify his behavior and to violate his beliefs.'"  *Priests for Life v. U.S. Dep't of Health & Human Servs.*, 772 F.3d 229, 246 (D.C. Cir. 2014) (quoting *Kaemmerling v. Lappin*, 553 F.3d 669, 678 (D.C. Cir. 2008)).  In considering whether the procedures for obtaining a religious accommodation are themselves burdens on the free exercise

rights, courts have looked to the precise nature of the procedures imposed.  Mere inconveniences, inconsequential or *de minimis* government actions that burden religious exercise do not suffice to qualify as a "substantial burden."  *See Priests for Life*, 772 F.3d at 246 ("A burden does not rise to the level of being substantial when it places '[a]n inconsequential or *de minimis* burden' on an adherent's religious exercise." (quoting *Kaemmerling*, 553 F.3d at 678)); *id.* at 248 ("Burdens that are only slight, negligible, or *de minimis* are not substantial."); *Smith v. Allen*, 502 F.3d 1255, 1278 (11th Cir. 2007) ("[A]t a minimum the substantial burden test requires that a RLUIPA plaintiff demonstrate that the government's denial of a particular religious item or observance was more than an inconvenience to one's religious practice."), *abrogated on other grounds by Sossamon v. Texas*, 563 U.S. 277 (2011); *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 (11th Cir. 2004) ("[A] 'substantial burden' must place more than an inconvenience on religious exercise.").  At the same time, procedures that render a requested religious accommodation virtually impossible to achieve have been found to be substantially burdensome.  *See, e.g.*, *Nelson v. Miller*, 570 F.3d 868, 878–79 (7th Cir. 2009) (requiring prisoner to show that religion compelled the practice in question and verify compelled practice with documentation imposed substantial burden by making desired religious exercise "effectively impracticable"); *Koger v. Bryan*, 523 F.3d 789, 797 (7th Cir. 2008) (requiring prisoner to show preferred diet was compelled by religion and religious belief to be verified by clergy for entitlement to religious accommodation was substantial burden and contrary to RLUIPA).

The D.C. Circuit recently addressed this issue in *Priests for Life*.  There, the plaintiffs challenged the "regulatory accommodation for religious nonprofit organizations that permits them to opt out of the contraceptive coverage requirement under the Patient Protection and

Affordable Care Act ('ACA'), 42 U.S.C. § 300gg-13(a)(4)" on grounds that the procedure "itself imposes an unjustified substantial burden on Plaintiffs' religious exercise in violation of" RFRA. 772 F.3d at 235; *see id.* at 245–46 ("Plaintiffs argue that a religious accommodation, designed to permit them to free themselves entirely from the contraceptive coverage requirement, itself imposes a substantial burden."). The Court concluded that the challenged opt-out procedure did "not impose a substantial burden on Plaintiffs' religious exercise under RFRA," noting that "[a]ll Plaintiffs must do to opt out is express what they believe and seek what they want via a letter or two-page form," which amounted to a "bit of paperwork [that] is more straightforward and minimal than many that are staples of nonprofit organizations' compliance with law in the modern administrative state." *Id.* at 237.

The specialized helmet and gas mask testing challenged in the TRO application involves far more than a *de minimis* administrative obligation of completing a one or two-page document but falls short of constituting an "effectively impracticable" requirement for obtaining a religious accommodation in the military. This makes this a close case. Nevertheless, the Court is persuaded that requiring the plaintiff to undergo the specialized testing for further processing of his religious accommodation request is a substantial burden when such testing is not required for soldiers to obtain exceptions from the Army uniform and grooming regulations on grounds other than adherence to the Sikh religious articles of faith.

The testing ordered in this case is not required of any other soldier, including soldiers who "use relaxed grooming standards" on military missions. *See* Hr'g Tr. at 16–18. With respect to helmets, the defendants explained at oral argument that, "[u]nder normal circumstances, the average soldier is fitted" for a helmet only once, during basic training or initial schooling. *Id.* at 19. After that, "the soldier is responsible for ensuring a proper fit in

conjunction with his chain of command." *Id.*; *see also* Pl.'s Mem., Ex. A, Decl. of Kamaljeet

Singh Kalsi (Feb. 27, 2016) ("Kalsi Decl.") ¶ 15, ECF No. 2-2 (attesting, from personal

experience and observations as an Army soldier, that "soldiers do not undergo evaluation for

helmet fit" but are instead "left to choose a helmet that fits them based primarily on their own

assessment" and "frequently adjust, remove, or add padding . . . on their own, with no external

evaluation or validation"); Pl.'s Mem., Ex. B, Decl. of Simran Preet Singh Lamba (Feb. 27,

2016) ("Lamba Decl.") ¶¶ 20–22, ECF No. 2-3 (same); Pl.'s Decl. ¶ 6 (same).  Though safety

concerns might warrant testing to evaluate the helmet and mask safety of Special Forces soldiers

"deployed into environments where they[] . . . use relaxed grooming standards," no safety tests

on these soldiers are required.  Hr'g Tr. at 18; *see also* Kalsi Decl. ¶¶ 6, 11–12, 14 (attesting,

from personal experience and observations as an active duty officer deployed to Afghanistan in

2011, who was required to have "enhanced familiarity with the use of the Army's standard-issue

M-40 protective mask and Kevlar helmet" for his assignment, that Special Forces soldiers who

"had beards and long hair" and "did not have to undergo specialized fitting for protective masks

or helmets").

      The defendants proffer that helmet testing, or "fitting," for Special Forces soldiers is not

necessary because "it's the way their hairstyle operates.  In other words, they don't wear a bun of

hair on top of their head or any . . . material on top of their head that would change the

geometrical shape of their head."  Hr'g Tr. at 19; *see also* Defs.' App. at A10, Decl. of James Q.

Zheng (Feb. 29, 2016) ("Zheng Decl.") ¶¶ 5–6 ("express[ing] concern" about "some Sikh

soldiers, following a religious accommodation" and wearing a helmet "with unshorn hair tucked

under the helmet and a cloth headcovering" because performance of the helmet could be

"degraded to a level that could compromise a soldier's safety" from a "geometry deviation").

Testing the plaintiff right now, however, may not allow the defendants to evaluate the fit of the plaintiff's helmet under the specific conditions that are the cause of concern.  The plaintiff only received a religious accommodation this past October and, consequently, the unshorn hair on his head "is currently only about three inches long."  Pl.'s Decl. ¶ 4.

Moreover, the defendants have provided no explanation as to why the plaintiff's beard is a potential safety hazard requiring specialized gas mask testing when the beards of Special Forces soldiers deployed in war zones with "relaxed grooming standards" are no such hazard and require no such testing.  Similarly, the Army has granted medical exceptions to thousands of service members, allowing them to grow beards without any specialized gas mask testing.  *See* Pl.'s Mem. at 34.  The defendants contend that those medical exceptions are different because they allow for only a very small amount of facial hair growth.  Hr'g Tr. at 23–24.  An Army study conducted in 2009, however, indicated that even "the presence of facial hair . . . degrades the performance of protective masks."  Pappas Decl. ¶ 3.

Not even soldiers subject to the Army's "Hard to Fit" protocol are subject to the level of specialized testing ordered for the plaintiff.  The "Hard to Fit" protocol, which is used for individuals who have unusual "anthropomorphic features such as head size or facial feature composition" to ensure a "satisfactory fit with the standard issue protective mask," requires a "M41 protective assessment test system (PATS)."  Pappas Decl. ¶ 3.  PATS testing is "used at the unit level" and requires soldiers merely to perform "five exercises."  *Id.* ¶ 4.  While the Army deems this testing sufficient for "Hard to Fit" service members, the plaintiff is being required to undergo "corn oil aerosol" testing, "the most accurate of the three types of mask evaluation procedures used by the Army," *id.* ¶¶ 3–4, which will require a series of exercises and "trials" that will take up to three days, *id.* ¶¶ 5–6.  This level of specialized testing is generally unheard

21

of, perhaps due to the costs.  *See* Kalsi Decl. ¶ 13; Lamba Decl. ¶ 21; Khalsa Decl. ¶ 25; Pl.'s Decl. ¶¶ 5–7.

Lastly, despite the fact that the Army has "never tested the ACH [helmet] in the manner CPT Singh has requested to wear it," Zheng Decl. ¶ 7, nor "evaluated whether the use of hair gels or Vaseline on an individual's facial hair may affect the performance of the protective mask," Pappas Decl. ¶ 3, the Army has granted permanent religious accommodations in the past to other Sikh soldiers without any specialized testing.  *See* Kalsi Decl. ¶ 5; Lamba Decl. ¶¶ 8, 15; Khalsa Decl. ¶ 10.  Each of these Sikh soldiers served with merit on active duty deployments, and one of them, like the plaintiff, was awarded a Bronze Star Medal, in part for his "coordination of five mass casualty exercises" in Afghanistan, which he performed adhering to his articles of faith.  Kalsi Decl. ¶ 8.

Singling out the plaintiff for specialized testing due only to his Sikh articles of faith is, in this context, unfair and discriminatory.  It is this singling out for special scrutiny—indeed, with the initial precaution of requiring an escort and observers for the plaintiff as he was subjected to the tests—that has a clear tendency to pressure the plaintiff, or other soldiers who may wish to seek a religious accommodation, to conform behavior and forego religious precepts.  Even if not intended, such pressure and its concomitant coercive effects on a religious adherent amounts to a "substantial burden."  *See Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1316 (10th Cir. 2010) (recognizing a "'coercion' aspect to substantial burden") ("[The Supreme] Court has repeatedly held that indirect coercion or penalties on the free exercise of religion, not just outright prohibitions, are subject to scrutiny under the First Amendment." (quoting *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 450 (1988))).  Consequently, the Court finds that the

plaintiff has met his burden to show a likelihood of success in establishing a *prima facie* case under RFRA.

### 2.     *Compelling Interest Test*

Given the plaintiff's likelihood of success in making out a *prima facie* case that the specialized testing, in the context of this case, violates RFRA, the defendants must show that the testing furthers a compelling government interest and does so by the least restrictive means.  The government unquestionably has a compelling interest in ensuring the health and safety of military personnel, including the plaintiff, and by conducting these specialized helmet fitting and gas mask tests on the plaintiff—or, as plaintiff's counsel succinctly put it, using the plaintiff as a "lab rat for the military," Hr'g Tr. at 51:23–24—the Army may obtain information useful to keeping soldiers safer, thereby furthering this compelling interest.

The proposed restriction on the plaintiff's right to free exercise by way of the individualized, intensive helmet and gas mask testing is not the least restrictive means of furthering the government's interest in helmet and gas mask safety, however.  Indeed, conducting or commissioning a study of the efficacy of helmets and gas masks for soldiers donning a variety of unshorn hair, beards, and/or head coverings, which does not target one particular Sikh soldier merely because of his request for a religious accommodation, would be *more* effective in furthering the government's compelling interest in ensuring the health and safety of its soldiers.  This is particularly true in light of the "relaxed grooming standards" and medical exceptions that the Army grants to thousands of soldiers.  Conducting or commissioning such a study would not, unlike the testing ordered in this case, in-and-of-itself restrict or burden any one individual's right to free exercise, and the results of the study would likely provide more value to the government in ensuring the health and safety of military personnel generally.

The Supreme Court's decision in *Holt* is instructive.  That case involved a prisoner's challenge under RFRA to the prison's grooming policy limiting the length of beards.  135 S. Ct. at 859.  The Supreme Court credited the prison's compelling governmental interest in prison safety and security but concluded that the beard length policy at issue was not the least restrictive means of accomplishing those goals.  *Id.* at 863 (finding it "hard to take seriously" that "staunching the flow of contraband . . . would be seriously compromised by allowing inmate to grow a ½–inch beard").  The Court bolstered this conclusion by finding, first, that the grooming policy was "substantially underinclusive" by permitting prisoners with dermatological conditions to grow longer beards and hair on their heads.  *Id.* at 865–66.  The fact that "'[t]he proffered objectives are not pursued with respect to analogous nonreligious conduct,' . . . suggests that 'those interests could be achieved by narrower ordinances that burdened religion to a far lesser degree.'"  *Id.* at 866 (quoting *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 546 (1993)).  Second, the Court noted the fact that "many other prisons allow inmates to grow beards while ensuring prison safety and security," which also suggests that less restrictive means than a denial of the exemption would satisfy prison security and safety concerns.  *Id.*

Similarly, here, the Army's policy of specialized testing for this plaintiff as a condition for granting his religious accommodation request, based solely on hair and beard growth required by Sikh articles of faith, is "substantially underinclusive."  The defendants warn that "without information concerning the fit of the Advanced Combat Helmet (ACH) and protective mask, Defendants cannot ensure that Plaintiff's protective equipment provides appropriate protection" and that "[c]urrently available information indicates that the accommodation may present significant risks that the equipment would not work properly, and any such failure could place Plaintiff, his fellow soldiers, and the mission at risk."  Defs.' Proposed Briefing Schedule at 2–3,

24

ECF No. 17.  As discussed above, however, medical exceptions and "relaxed grooming standards" are granted without such specialized information, and even the Army's most "Hard to Fit" soldiers may serve without undergoing the level of specialized tests ordered of the plaintiff. Indeed, the existence of the "Hard to Fit" program undermines the defendants' argument that the specialized testing of the plaintiff is necessary for a determination on his accommodation. Additionally, as the plaintiff notes, even were the plaintiff to fail all of the specialized testing, "that could have no legitimate bearing on his accommodation" request because "[i]f the Army treats him like every other soldier, as it must, it would simply work with him to find a satisfactory solution through the existing 'hard to fit' program."  Pl.'s Resp. to Defs.' Proposed Briefing Schedule at 2, ECF No. 19.  In sum, the fact that health and safety "are not pursued with respect to analogous nonreligious conduct" to the degree in which those compelling interests are being pursued with respect to religious conduct "suggests that those interests could be achieved" by less burdensome means.  *Holt*, 135 S. Ct. at 866.

The defendants argue that they are in a "Catch 22 position" where, under RFRA and, specifically, *Holt*, they must do an "individualized assessment" for the plaintiff's accommodation request, but an unfavorable ruling on the plaintiff's TRO application will prohibit them from "conduct[ing] the tests that [they] believe are necessary" to determine whether the plaintiff's helmet and gas mask fit properly.  Hr'g Tr. at 62.  The defendants misinterpret *Holt*.  The emphasis in *Holt* on a "more focused" inquiry into the "application of the challenged law to . . . the particular claimant," 135 S. Ct. at 863, relates to how the government must best respond to a person's particular belief system.

The defendants are correct that, should they deny the plaintiff's religious accommodation request, they may "not merely . . . explain why" they denied it, but also must "prove that denying

the exemption is the least restrictive means of furthering a compelling governmental interest." *Holt*, 135 S. Ct. at 864. This does not mean, however, that the defendants may infringe upon the very right RFRA protects in order to meet their burden of proof. Otherwise, the government would be able to end-run around RFRA.

As Justice Sotomayor suggests in her concurrence in *Holt*, courts should defer to "officials' reasoning when that deference is due—that is, when . . . officials offer a plausible explanation for their chosen policy *that is supported by whatever evidence is reasonably available to them*." *Holt*, 135 S. Ct. at 867 (Sotomayor, J., concurring) (emphasis added). Here, where the defendants must obtain evidence by substantially burdening the plaintiff's free exercise rights (*i.e.*, as discussed *supra* in Part III.B.1, by subjecting him to testing required of no other soldier seeking a similar exemption from Army uniform and grooming rules) in order to support their policy that substantially burdens the plaintiff's free exercise rights (*i.e.*, by prohibiting the plaintiff from wearing his articles of faith) that evidence is, by no means, "reasonably available to them." In short, the defendants may not violate RFRA in an attempt to justify another potential violation of RFRA.

\*       \*       \*

The Court concludes that even if the defendants have a compelling interest in the execution of the specialized testing order challenged in this TRO application, the defendants have not met their burden to show it is the least restrictive means available to further their interest. Thus, the plaintiff has shown a likelihood of success on the merits and met the first prong for his TRO application.

### C.        Irreparable Harm

The D.C. Circuit "has set a high standard for irreparable injury" to warrant preliminary injunctive relief.  *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)). In order to be considered "irreparable," the injury "must be 'both certain and great,' 'actual and not theoretical,' 'beyond remediation,' and 'of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm.'"  *Id.* (emphasis in original) (quoting *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297).  Generally, however, "[w]hen an alleged deprivation of a constitutional right is involved, such as the right to . . . freedom of religion, most courts hold that no further showing of irreparable injury is necessary."  11A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2948.1 (3d ed. 2013); *see also Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) ("It has long been established that the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)).

The defendants argue that the plaintiff cannot show any harm for the same reason they argue the plaintiff cannot show substantial burden—because all of the "testing would be completed with CPT Singh's articles of faith intact."  Defs.' Opp'n at 8–9.  The defendants ignore the fact that the plaintiff has been singled out to complete three days of helmet and gas mask testing simply because of his request for a religious accommodation.  Whether intentional or not, this is discriminatory, and as the plaintiff notes, "being subjected to discrimination is by itself an irreparable harm."  Pl.'s Reply Mem. Supp. Appl. TRO at 13, ECF No. 16; *see also Smith v. City of Jackson*, 544 U.S. 228, 249 (2005) (O'Connor, J., concurring) (noting, in the

context of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 623(a), that "discriminating against" an individual is "*inherently harmful* to the targeted individual" (emphasis in original)).  Thus, the plaintiff has met the irreparable harm prong for injunctive relief.

### D.      Balance of Equities

The third factor for injunctive relief requires a showing that the balance of hardships warrants an equitable remedy.  In making this assessment, the court may consider whether the requested injunctive relief would "substantially injure other interested parties."  *Ark. Dairy Co-op Ass'n, Inc. v. U.S. Dep't of Agric.*, 573 F.3d 815, 821 (D.C. Cir. 2009) (framing the balance of harms factor as an inquiry into whether "an injunction would substantially injure other interested parties"); *see also Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (same).

In this case, the balance of harms weighs in the plaintiff's favor.  Aside from the harm discussed above, *see supra* Part III.C, denial of the injunctive relief sought in the plaintiff's pending motion would sanction the defendants' imposition of targeted, specialized testing requirements on a decorated officer simply because he requested a religious accommodation to the Army's grooming and appearance regulations.  This would likely have, as the plaintiff points out, a chilling effect on religious minorities, not only Sikhs, who desire lawfully to practice their religion while serving this country in the Armed Forces.  As the plaintiff explains, "[i]f there is a perception that soldiers from minority religions who apply for a religious accommodation will then be 'given the third degree' as a penalty just for asking, the Army's promise to provide religious accommodations will prove entirely illusory."  Pl.'s Mem. at 42.

28

The defendants make two arguments with respect to the equities.[3]  First, they argue, as they do with respect to the substantial burden, that they will be harmed by the granting of the instant temporary restraining order because they will be unable to obtain important information relevant to a final decision on the plaintiff's accommodation request.  *See* Defs.' Opp'n at 10. The granting of this TRO application, however, will not prevent the defendants from obtaining important information about the safety of Army helmets or gas masks.  If the defendants want information about the safety of helmets and gas masks, such studies may be conducted in a controlled environment where one particular individual's religious freedom is not at stake.

Second, the defendants argue that a temporary restraining order "would be disruptive to affairs peculiarly within the jurisdiction of the military authorities," Defs.' Opp'n at 9 (citing *Orloff*, 345 U.S. at 94–95), and "interfere[] with the proper functioning of our military forces," *id.*  They urge the Court to "consider the precedential effect that granting the injunction would have on the military as a whole" and "not [to] focus narrowly on this single case," warning the Court of the "harm to the Army from judicial intrusion into military affairs."  *Id.* at 10.  The defendants further assert that "[a] temporary restraining order, in this case, could have far-reaching effects on the military's ability to maintain discretion on the composition of the force and discipline of its soldiers" which are "weighty considerations."  Defs.' Opp'n at 11.

These dire warnings are not taken lightly, but they are misplaced.  The Court must focus on the particular case or controversy pending before it, and this particular case poses no risk of "far-reaching effects" on military discipline.  In this case, a decorated officer seeks relief from an

---

[3]      Though the defendants contend that the balance of equities and public interest factors "merge when the Government is the opposing party," Defs.' Opp'n at 9 (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)), the authority cited for that proposition does not apply to temporary or preliminary injunctive relief, but rather to stays of removal under the Illegal Immigration Reform and Immigration Responsibility Act of 1996, 8 U.S.C. § 1252.  *Nken*, 556 U.S. at 423–24.  As the plaintiff notes in his reply, "[t]he Supreme Court's latest examination of the preliminary injunction factors in a case involving federal defendants treats the factors separately."  Pl.'s Reply at 16 (citing *Winter*).

order to submit to nonstandard testing for which he has been singled out due to his request for

the Army to accommodate his constitutional and statutory right to religious exercise.  Thus, to

the extent that the defendants claim harm from an injunction against application of an unlawful

order that impinges upon a soldier's free exercise right, the scale of equities falls squarely on the

plaintiff's side.

### E.   Public Interest

The public interest in this case weighs strongly in favor of the plaintiff, despite the

defendants' argument to the contrary.  The defendants argue that, "[t]he injunctive relief sought

here would unduly interfere with the public's recognized interest in efficient administration of

military personnel matters," and affect the public's undisputed "interest in maintaining an

effective military."  Defs.' Opp'n at 11.  Again, the defendants' arguments are not taken lightly.

"[C]ourts of equity should pay particular regard for the public consequences in employing the

extraordinary remedy of injunction," *Winter*, 555 U.S. at 24 (quoting *Romero-Barcelo*, 456 U.S.

305, 312 (1982)), and an injunction's "adverse impact on the public interest in national defense"

cannot be understated, *id.*  Here, however, the granting of the requested injunctive relief would

not have an impact on the national defense or the Army's ability to protect our nation's security.

This case is distinguishable from those military cases which directly implicate public

safety or national security.  For example, in *Winter*, the Supreme Court reversed a court's grant

of "a preliminary injunction imposing restrictions on the Navy's sonar training," including "the

use of modern sonar to detect and track enemy submarines."  555 U.S. at 12.  Noting that the

training exercises only allegedly harmed marine mammals, and that the extent of the harm, if

any, was disputed, the Court found "that the balance of equities and consideration of the overall

public interest" weighed "strongly in favor of the Navy."  *Id.* at 14, 26.  The Court explained that

30

the injunction would "forc[e] the Navy to deploy an inadequately trained antisubmarine force," "jeopardize[] the safety of the fleet," and undermine the President's "determin[ation] that training with active sonar is 'essential to national security.'" *Id.* at 26. The Court also recognized that the injunction would "hinder efforts to train sonar operators under realistic conditions, ultimately leaving strike groups more vulnerable to enemy submarines." *Id.* at 31. The Court thus concluded, "[t]he public interest in conducting training exercises with active sonar under realistic conditions plainly outweighs the interests advanced by the plaintiffs." *Id.* at 26.

This case is simply not analogous. The Court's grant of injunctive relief would prohibit specialized, nonstandard testing of a single officer currently based in Virginia. It would in no way jeopardize Army training or safety, nor would it undercut an Executive branch national security determination. One decorated officer's attempt to vindicate his constitutionally and statutorily-protected religious rights does not "unduly interfere" with the "efficient administration of personnel matters."

On the other hand, the public has a significant interest in having a diverse military, reflective of the composition of our country and accepting of religious minorities. Indeed, the Army recognized this interest in creating the "Military Accessions Vital to the National Interest (MAVNI) program," under which individuals may enlist where they "possess cultural and linguistic skills," including fluency in certain languages, which "are considered vital to our national interest." Lamba Decl. ¶ 4. The specialized testing the Army seeks to conduct in this case is perceived as "discriminatory and demeaning," *id.* ¶ 24; Khalsa Decl. ¶ 28; Kalsi Decl. ¶ 18, and it is likely to discourage Sikhs and other minorities from military service. Therefore, in

these circumstances, the public's best interest weighs heavily in favor of granting the plaintiff's TRO application.

## IV.     CONCLUSION

For the foregoing reasons, the plaintiff's Application for Temporary Restraining Order, ECF No. 2, is granted.  Accordingly, the defendants are preliminarily enjoined from subjecting the plaintiff to any non-standard or discriminatory testing for his helmet and gas mask during the pendency of the litigation.

The parties are directed to confer and jointly submit, by 5:00 p.m. on March 4, 2016, a proposed briefing schedule to govern further proceedings in this case.

An appropriate Order accompanies this Memorandum Opinion.

Date:  March 3, 2016

_____
BERYL A. HOWELL
United States District Judge